# EXHIBIT 1

CIRCUIT COURT FOR BALTIMORE CITY
Xavier A. Conaway
Clerk of the Circuit Court
Courthouse East
111 North Calvert Street
Room 462
Baltimore, MD 21202-
(410)-333-3722, TTY for Deaf: (410)-333-4389


W R I T   O F   S U M M O N S   ( P r i v a t e   P r o c e s s )
                          Case Number: 24-C-23-002529 OC
                          C I V I L
State Of Maryland vs 3M Company, et al

STATE OF MARYLAND, BALTIMORE CITY, TO WIT:


        To: 3M COMPANY
Serve On: CSC-lawyers Incorporating Service Company
          7 St. Paul Street, Suite 820
          Baltimore, MD 21202


     You are hereby summoned to file a written response by pleading or motion,
within 30   days after service of this summons upon you, in this court, to
the attached Complaint filed by:   State Of Maryland
                                   200 Saint Paul Place
                                   Baltimore, MD 21202


WITNESS the Honorable Chief Judge of the Eighth Judicial Circuit of
Maryland


Date Issued:   05/31/23
                          Xavier A. Conaway
                          Clerk of the Circuit Court, per_____


To the person summoned:

FAILURE TO FILE A RESPONSE WITHIN THE TIME ALLOTTED MAY RESULT IN A JUDGMENT
BY DEFAULT OR THE GRANTING OF THE RELIEF SOUGHT AGAINST YOU.

Personal attendance in court on the day named is NOT required.

# IN THE CIRCUIT COURT FOR BALTIMORE CITY

| | | |
|---|---|---|
| STATE OF MARYLAND,<br>200 Saint Paul Place<br>Baltimore, Maryland 21202 | * | |
| | * | |
| *Plaintiff,* | * | Case No. |
| | * | |
| v. | * | **COMPLAINT** |
| | * | **JURY TRIAL DEMANDED** |
| 3M COMPANY,<br>3M Center<br>St. Paul, Minnesota 55144-1000, | * | FILED |
| | * | |
| Serve on:<br>CSC-Lawyers Incorporating<br>Service Company<br>7 St. Paul Street, Suite 820<br>Baltimore, Maryland 21202 | * | MAY 3 0 2023<br>CIVIL DIV.<br>...URT FOR<br>... CITY |
| | * | |
| *and* | * | |
| CORTEVA, INC.,<br>974 Centre Road<br>Wilmington, Delaware 19805, | * | |
| | * | |
| Serve on:<br>The Corporation Trust, Inc.<br>2405 York Road, Suite 201,<br>Lutherville Timonium,<br>Maryland 21093-2264 | * | |
| | * | |
| *and* | * | |
| DUPONT DE NEMOURS, INC.,<br>974 Centre Road<br>Wilmington, Delaware 19805, | * | |
| | * | |
| Serve on:<br>The Corporation Trust<br>Company<br>Corporation Trust Center<br>1209 Orange Street<br>Wilmington, Delaware 19801 | * | |

*and*                *

EIDP, INC., F/K/A E.I. DU PONT     *
DE NEMOURS AND COMPANY,
974 Centre Road                *
Wilmington, Delaware 19805,

                               *

    Serve on:
    The Corporation Trust, Inc.     *
    2405 York Road, Suite 201
    Lutherville Timonium,        *
    Maryland 21093-2264

                               *

*and*               

                               *

THE CHEMOURS COMPANY,
1007 Market Street           *
Wilmington, Delaware 19899,

                               *

    Serve on:
    The Corporation Trust Inc.     *
    351 West Camden Street
    Baltimore, Maryland         *
    21201-7912

                               *

*Defendants.*

                               *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

# COMPLAINT

Plaintiff, the State of Maryland (the "State"), by and through Anthony G. Brown, Attorney General of Maryland, and counsel, on behalf of the Maryland Department of Environment (the "Department" or "MDE"), the Maryland Department of Health ("MDH"), and the Maryland Department of Natural Resources ("DNR"), files this Complaint against the above-named Defendants and in support thereof alleges as follows:

## INTRODUCTION

1.    The State brings this action against Defendants to address widespread contamination of its natural resources—particularly the drinking water supplies upon which its citizens depend—with toxic per- and polyfluoroalkyl substances ("PFAS"), including but not limited to perfluorooctane sulfonic acid ("PFOS") and perfluorooctanoic acid ("PFOA").[1]

2.    Defendants are among the world's largest chemical manufacturers, and they are responsible for the PFAS contamination within Maryland.    They designed, manufactured, marketed, and sold products that contain PFAS ("PFAS Products"),[2] which have entered the State's environment through multiple pathways, contaminated its resources, and put its residents' health at risk.

3.    Defendants' PFAS have been used since the 1940s to make countless consumer and commercial products that were marketed for their resistance to grease, stains,

---

[1] Although this action focuses on PFOS and PFOA, the State reserves the right to seek relief related to additional PFAS that are found to have contaminated its resources, based on continuing investigation and scientific developments.    At the time of this Complaint's filing, the United States Environmental Protection Agency ("EPA") has proposed national drinking water regulations for both PFOS and PFOA, but also for PFBS (Perfluorobutane sulfonic acid), PFHxS (Perfluorohexane sulfonic acid), PFNA (Perfluorononanoic acid), and HFPO-DA (Hexafluoropropylene oxide dimer acid, also known as "GenX"). MDE and the Maryland Department of Health are monitoring these developments closely.

[2] As used in this Complaint, the term "PFAS Products" means PFAS and those products that contain PFAS or release PFAS into the environment.  The term does not, however, include aqueous film-forming foam ("AFFF") or fluorosurfactants that were designed for and specifically incorporated into AFFF, which are the subject of a separate action.

heat, and other harsh elements. Among other items, Defendants' PFAS were used to make and were present in food packaging, carpeting, cookware, clothing, and upholstery, including in products branded under household names like Teflon and Scotchgard. Defendants sold these PFAS Products in Maryland and throughout the country, generating significant profits.

4.      At the same time Defendants were profiting from the sale of these PFAS Products, they knew for decades that their PFAS were toxic and posed significant risks to human health and the environment. Internal documents reveal that Defendants had determined that their PFAS chemicals were harmful and were accumulating in the human blood supply. Defendants did not warn of the dangers posed by their PFAS Products, but instead concealed those dangers to protect their corporate image and limit their liability.

5.      Defendants knew specifically that their PFAS were reaching drinking water supplies and accumulating in people's bodies as they were exposed to the chemicals over time. They also knew that PFAS, now commonly referred to as "forever" chemicals, were persistent and would remain in the environment for hundreds or even thousands of years, leaving a toxic legacy for future generations.

6.      Because of Defendants' profit-driven effort to conceal these risks from federal and state regulators and the public more broadly, the public health and environmental consequences of Defendants' manufacture, marketing, and sale of PFAS Products in Maryland and elsewhere have only recently come to light. Only through lawsuits like this one were Defendants eventually compelled to disclose what they have long known about the dangers of their PFAS Products.

7.     As details of those risks began to be disclosed, states and the federal government have initiated their own investigations into the risks posed by these PFAS Products and the extent of contamination that they have caused. Those investigations remain ongoing, but initial results show that Defendants' PFAS Products have been introduced into the environment in many different ways, including through discharges and emissions from industrial facilities, the use and disposal of PFAS-containing products, landfills receiving PFAS-containing waste, and wastewater treatment facilities containing PFAS-contaminated waste streams. The magnitude and ubiquity of these sources of contamination compound the challenge and expense of remediating the harm that Defendants have caused.

8.     Defendants' unlawful and tortious acts and omissions with respect to their PFAS Products have caused significant PFAS contamination in the State's drinking water, groundwater, surface water, soil, sediment, wildlife, other natural resources, and property held in trust or otherwise owned by the State.

9.     In the meantime, Marylanders have been and continue to be exposed to PFAS through drinking contaminated water, eating contaminated fish and animals, ingesting contaminated soil or dust, consuming food packaged in PFAS-containing materials, and using products treated with PFAS, among other ways.

10.     Federal regulatory investigations have concluded that exposure to PFAS may lead to significant negative health effects, including but not limited to: "Reproductive effects such as decreased fertility or increased high blood pressure in pregnant women; developmental effects or delays in children including low birth weight, accelerated puberty,

5

bone variations, or behavioral changes; increased risk of some cancers, including prostate, kidney, and testicular cancers; reduced ability of the body's immune system to fight infections, including reduced vaccine response; interference with the body's natural hormones; [and] increased cholesterol levels and/or risk of obesity." Environmental Protection Agency, *Our Current Understanding of the Human Health and Environmental Risks of PFAS*, https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas (last visited May 22, 2023).

11.    Although Defendants knew that their PFAS Products would release PFAS into the environment, endanger people and natural resources, and require significant expense to remediate, they concealed that information and affirmatively contradicted it in public statements and marketing campaigns designed to enrich themselves at the public's expense.

12.    Because of Defendants' concealment, the State was unaware for decades of the risks posed by PFAS. As news about PFAS risks spread, the State began its own investigation into the extent of this PFAS contamination. As that investigation unfolds, the State will inevitably learn of more contamination from PFAS Products, increasing the cost necessary to investigate, treat, and remediate the contamination that Defendants have caused. Given that Defendants created and profited from this environmental hazard, Defendants, and not Maryland's citizens, must pay to address the PFAS contamination throughout the State.

## SCOPE OF THE ACTION

13.    The State brings this action to hold Defendants fully accountable for the harms done to Maryland, its citizens, and its natural resources from Defendants' PFAS Products.    Through this action the State does not, however, seek any remediation, restoration, damages, or any other relief related to any PFAS contamination caused by AFFF or fluorosurfactants when used as ingredients of AFFF. The State's claims with respect to AFFF are the subject of a separate action.

## PARTIES

### *The State of Maryland as Plaintiff*

14.    The State brings this action (a) directly in its own right, (b) in its *parens patriae* capacity, and (c) as trustee of Maryland's natural resources.

15.    The State holds significant direct property interests in natural resources of the State and State-owned lands, but also has an interest as a sovereign and natural resource trustee in protecting the natural resources of the State from contamination.    The contamination of the natural resources of the State by PFAS constitutes injury to the person and property of the State's citizens and to the natural resources of the State, which are held in trust by the State on behalf of all its citizens.    The State may for the common good exercise all the authority necessary to protect its interests and those of its citizens.

16.    The State, as the public trustee, is empowered to bring suit to protect the corpus of the trust, i.e., the natural resources, for the beneficiaries of the trust, i.e., the public.    Protection of the natural resources of the State is a matter of public concern in which the State has an interest apart from that of particular individuals who may be

7

affected. Pollution of the natural resources of the State with PFAS has negatively affected a substantial segment of the State's population.

17.     The State brings this action pursuant to its police powers, which include but are not limited to its powers to prevent and abate pollution of the natural resources of the State, to prevent and abate nuisances, and to prevent and abate hazards to the environment and to the public health, safety, and welfare.

18.     The State, through its Attorney General, also brings this action under Title 9 of the Environment Article, which empowers the Secretary of the Environment, through the Attorney General, to bring suit against any person who "discharge[s] any pollutant into the waters of this State" without a permit. Md. Code Ann., Env't §§ 9-322, 9-339(a).

19.     The responsibilities of the Attorney General include the investigation, commencement, and prosecution of civil suits on the part of the State.  *See* Maryland Constitution, Art. V, § 3.  "[T]he Attorney General has general charge of the legal business of the State." Md. Code Ann., State Gov't § 6-106.

20.     As a result of Defendants' acts and omissions as alleged herein, the State has suffered and will continue to suffer injuries to its natural resources and has incurred and will continue to incur costs to define the extent of PFAS contamination throughout the State; to monitor, treat, remediate, and remove PFAS; and to provide oversight of such activities.

***Defendants***

21.     Defendant 3M Company ("3M") is a Delaware Corporation qualified to do business in Maryland.  Its principal place of business is 3M Center, St. Paul, Minnesota

55144-1000. 3M manufactured, marketed, and sold PFAS Products that were used or otherwise released in the State.

22.     Defendant EIDP, Inc. ("Old DuPont"), f/k/a E. I. du Pont de Nemours and Company, is a Delaware corporation qualified to do business in Maryland. Its principal place of business is at 974 Centre Road, Wilmington, Delaware 19805. Old DuPont manufactured, marketed, and/or sold PFAS Products that were used or otherwise released in the State.

23.     Defendant The Chemours Company is a Delaware corporation qualified to do business in Maryland. Its principal place of business is at 1007 Market Street, Wilmington, Delaware 19899. In 2015, Old DuPont spun off its performance chemicals business to Chemours, along with vast environmental liabilities. In connection with these transfers, Chemours assumed certain Old DuPont liabilities, including those relating to PFAS.

24.     Defendant Corteva, Inc. is a Delaware corporation qualified to do business in Maryland. Its principal place of business is at 974 Centre Road, Wilmington, Delaware 19805. In 2019, DuPont de Nemours, Inc. spun off a new, publicly-traded company, Corteva, which currently holds Old DuPont as a subsidiary. In connection with these transfers, Corteva assumed certain Old DuPont liabilities, including those relating to PFAS.

25.     Defendant DuPont de Nemours, Inc. ("New DuPont"), f/k/a DowDuPont Inc., is a Delaware corporation. Its principal place of business is at 974 Centre Road, Wilmington, Delaware 19805. In 2015, after Old DuPont spun off Chemours, Old DuPont merged with The Dow Chemical Company and transferred Old DuPont's historic assets

9

and liabilities to other entities, including New DuPont.  In connection with these transfers,

New DuPont assumed certain Old DuPont liabilities, including those relating to PFAS.

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction over this matter under § 1-501 of

the Courts and Judicial Proceedings Article and Maryland Rule 2-305(b) because this civil

action seeks and demands money damages in an amount that exceeds $75,000.00.

27.     This Court has personal jurisdiction over Defendants because they will be

served with process in Maryland; are organized under the laws of Maryland; transact

business in Maryland; perform work in Maryland; contract to supply goods in Maryland;

manufacture products or performed services in Maryland; caused tortious injury in

Maryland; engage in persistent courses of conduct in Maryland; derive substantial revenue

from manufactured goods, products, or services used or consumed in Maryland; and/or

have interests in or use real property in Maryland.

28.     Venue is proper in this Court as to all Defendants under §§ 6-201 and 6-202

of the Courts and Judicial Proceedings Article.

## FACTUAL ALLEGATIONS

### A.    PFAS Endangers Maryland's Environment and Citizens.

29.     PFAS are highly fluorinated synthetic chemical compounds that include

carbon chains containing at least one carbon atom on which all hydrogen atoms are

replaced by fluorine atoms.  The carbon-fluorine bond is one of the strongest bonds in

chemistry and imparts to PFAS their unique chemical properties.  The carbon-fluorine bond

in PFAS generally does not occur in nature.

30.  The PFAS family, including PFOS and PFOA, has characteristics that cause extensive and long-lasting environmental contamination.

31.  PFAS are mobile and persistent in the environment. Once introduced into the environment, PFAS quickly spread because they easily dissolve in water. PFAS also persist in the environment indefinitely because of their multiple carbon-fluorine bonds, which are exceptionally strong and stable, and are resistant to metabolic and environmental degradation processes. Similarly, removal of PFAS from drinking water sources requires specialized, and expensive, drinking water treatment systems. In short, once PFAS are used, they migrate through the environment, resist natural degradation, contaminate groundwater and drinking water, and are difficult and costly to remove.

32.  PFAS bioaccumulate and biopersist in animals and are toxic to their health. Because several PFAS, including PFOS and PFOA, are excreted from individual organisms only slowly, ongoing low-level exposure results in a buildup of PFAS within the body. Thus, PFAS can also biomagnify, meaning that their concentration in organic tissue increases as they are consumed up the food chain.

33.  PFAS are toxic and cause significant adverse effects to human health. The presence of these chemicals in drinking water presents a serious threat to public health. For example, PFOS exposure is associated with numerous adverse health effects in humans, including increases in serum lipids, i.e., high cholesterol; decreases in antibody response to vaccines; increases in risk of childhood infections; and adverse reproductive and developmental consequences, along with high blood pressure and preeclampsia during pregnancy. PFOA exposure is associated with many of these same adverse health effects

11

as well as decreased birthweight, testicular and kidney cancers, ulcerative colitis, and thyroid disease.

34.  Even low doses of PFAS can result in adverse health effects for humans and animals.

35.  On June 15, 2022, EPA lowered the Health Advisory Limits for PFOA and PFOS. The new interim Health Advisory Limits are 0.004 parts per trillion ("ppt") for PFOA and 0.02 ppt for PFOS. In March 2023, EPA released proposed drinking water standards for PFOS and PFOA, pursuant to the Safe Drinking Water Act. *See* 8 Fed. Reg. 18638 (Mar. 29, 2023). EPA proposed to establish maximum contaminant levels for PFOS and PFOA at 4 ppt, the lowest amount that can be reliably measured today based on available technology.

36.  PFAS can enter the environment in a variety of ways, compounding the problem the State currently faces.

37.  PFAS enter the environment from industrial facilities that manufacture or use PFAS. Industries understood to be sources of PFAS include, among others, textile and leather processing, paper mills, metal finishers, wire manufacturers, plating facilities, and manufacturers and facilities using fluorosurfactants, resins, molds, plastics, photolithography, and semiconductors. PFAS are released from these facilities to land, in water, and through air emissions.

38.  PFAS also enter the environment through the normal use and disposal of PFAS Products. Landfills receive consumer goods, industrial wastes, sewage sludge, and construction and demolition debris, all of which can contain PFAS. PFAS in all landfills,

active and closed, can leach from these wastes into groundwater and surface water. PFAS may also be released from landfills in fugitive dust or emitted directly to the atmosphere. Landfills constructed before 1990 that received industrial and construction waste deposits have a higher potential for PFAS releases because they were not required to be constructed with flexible membrane liners or other leachate-control measures. Nationwide studies in the United States, as well as studies in Canada and Europe, have shown high levels of PFAS in landfill leachate.

39.     Municipal and industrial wastewater treatment plants are also repositories for industrial and consumer waste containing PFAS. These facilities provide multiple pathways for PFAS to contaminate groundwater and surface water, including by point source discharges of effluent, leakage or unintended releases from sewerage or surface impoundments, air emissions, and disposal of biosolids or other byproducts generated during the treatment process. This results in further discharges of PFAS to water and introduces PFAS into biosolids used in agriculture and various other purposes.

40.     The PFAS that make it into Maryland's environment will remain in Maryland and continue to contaminate its resources, unless and until they are treated, removed, or otherwise cleaned up. The State is taking this action in an effort to meet the challenge of addressing PFAS in Maryland's environment.

**B.     Defendants' History Manufacturing and Selling PFAS Products.**

41.     3M and DuPont sold a wide variety of PFAS Products in Maryland and throughout the United States.

42.    Starting in the 1940s and through the early 2000s, 3M was the primary manufacturer of PFAS in the United States.

43.    Further, 3M was the only manufacturer of PFOS in the United States.

44.    Beginning in the 1940s, 3M manufactured PFOS and PFOA through a process known as electrochemical fluorination. Electrochemical fluorination produces a "branched" form of the chemicals that distinguishes them from PFAS produced through other processes. PFOA is also known as "C-8" due to its eight-carbon chain structure.

45.    3M manufactured PFOS and PFOA to make products used in a wide variety of commercial and household applications, including food packaging, textile treatments, and fluorosurfactants and additives.  Among these products are those branded with the name "Scotchgard," which was marketed as providing stain-resistant properties.   In addition to marketing and selling its own PFAS Products, 3M sold its PFOS and PFOA to third parties to use in their own products.

46.    Old DuPont has also had extensive experience with PFAS.  Beginning in the early 1950s, Old DuPont purchased PFOA from 3M so that it could produce and sell various products, including a wide variety of products containing polytetrafluoroethylene ("PTFE"), a fluoropolymer that DuPont marketed under the household trade name "Teflon." DuPont used PTFE in a wide range of other applications too, including as a processing aid, with the result that PFOA has been present in some Old DuPont products for decades.

47.    DuPont's use of PFOA expanded over time such that the company utilized it to make a growing number of products employed across wide sectors of consumer and

industrial applications, including food packaging, carpeting, clothing, upholstery, and paints, as well as treatment and cleaning products.

48.    When 3M ceased manufacturing PFOA in the early 2000s, and DuPont no longer had a supplier for this chemical, DuPont chose to begin manufacturing the chemical itself in the mid-2000s.

49.    DuPont manufactured PFOA using a telomerization process, which produces a linear form of PFOA, as opposed to the branched form of PFOA previously manufactured by 3M.

50.    DuPont claims that it phased out the manufacture and use of PFOA by 2015.

**1.    Defendants Knew, or Should Have Known, of the Harm Caused by their PFAS Products, and Attempted to Conceal Negative Information About These Chemicals.**

51.    3M internally studied PFAS for decades and accumulated sufficient knowledge to understand that PFAS were toxic and would adversely affect the environment and human health.

52.    As early as the 1950s, 3M began testing the physiological and toxicological properties of PFAS.  Based on these internal studies, 3M knew that PFAS were toxic to humans and harmful to the environment.

53.    In the 1950s, 3M also knew that PFAS had the ability to move throughout groundwater, and that PFAS bioaccumulate in humans and animals.

54.    By 1956, 3M's PFAS were found to bind to proteins in human blood, resulting in bioaccumulation of those compounds in the human body.

15

55.    3M knew as early as 1960 that its PFAS waste could leach into groundwater and otherwise enter the environment.  An internal 3M memorandum from 1960 described 3M's understanding that such wastes "[would] eventually reach the water table and pollute domestic wells."

56.    As early as 1963, 3M knew that its PFAS products were highly stable in the environment and did not degrade after disposal.  A 1963 report by 3M described PFAS as being stable in the environment, "completely resistant to biological attack," and "toxic." At around the same time, 3M also tested for PFAS in well water and confirmed the presence of surfactant pollution in wells.

57.    By the 1970s, 3M had become concerned about the risks posed to the general population by exposure to 3M's fluorochemicals.

58.    By no later than 1970, 3M was aware that its PFAS products were hazardous to marine life.  Around this time, 3M abandoned a study of its fluorochemicals after the company's release of the chemicals during the study caused severe pollution of nearby surface waters.

59.    In 1975, 3M found there was a "universal presence" of PFAS in blood serum samples taken from across the United States.  Since PFAS are not naturally occurring, this finding reasonably alerted 3M to the high likelihood that its products were a source of this PFAS—a scenario 3M discussed internally but did not share outside the company.  This finding also alerted 3M to the likelihood that PFAS are mobile, persistent, bioaccumulative, and biomagnifying, as those characteristics would explain the presence of PFAS in human blood.

60.     As early as 1976, 3M began monitoring for the presence of PFAS within the blood of its employees because the company was concerned about PFAS's health effects.

61.     In 1978, 3M conducted PFOS and PFOA studies in monkeys and rats. All monkeys died within the first few days or weeks after being given food contaminated with PFOS. The studies also showed that PFOS and PFOA affected the liver and gastrointestinal tract of the species tested. The company concluded that PFAS "should be regarded as toxic" and "urgently recommended that all reasonable steps be taken immediately to reduce exposure of employees to these compounds."

62.     In 1979, another 3M report concerning PFAS toxicity stated that the synthetic compounds were "more toxic than anticipated" and recommended that "lifetime rodent studies . . . be undertaken as soon as possible." Despite these warnings and recommendations, 3M decided to not publish the findings of this investigation.

63.     At a 1979 meeting among 3M employees about the "Fluorochemicals in Blood Program," an outside researcher, Dr. H.C. Hodge, noted that "[r]eduction in exposure [to 3M employees to fluorochemicals] should have top priority" and recommended that further testing be conducted. According to Dr. Hodge, "[i]t should be determined if FC-807 [a PFAS chemical] or its metabolites are present in man, what level they are present, and the degree of persistence (half-life) of these materials."

64.     In the late 1970s, 3M studied the fate and transport characteristics of PFOS in the environment, including in surface water and biota. The resulting report from 1979 drew a direct line between effluent from 3M's Decatur, Alabama, plant and

fluorochemicals bioaccumulating in fish tissue taken from the Tennessee River adjacent to the 3M plant.

65.    According to a 3M environmental specialist who resigned his position in 1991 due to the company's inaction over PFOS's environmental impacts, 3M had resisted calls from its own ecotoxicologists going back to 1979 to perform an ecological risk assessment on PFOS and similar chemicals.  At the time of the specialist's resignation, 3M continued its resistance to assessing the ecological risks of PFAS.

66.    In 1981, 3M moved 25 female employees "of childbearing potential" off production lines at its Decatur, Alabama, plant "[a]s a precautionary measure."  This was based on internal research showing that PFAS compounds were causing birth defects in rats.  Yet 3M did not alert the public or regulatory agencies of its concerns about the effects of exposure to PFAS.

67.    In 1983, 3M scientists opined that concerns about PFAS "give rise to legitimate questions about the persistence, accumulation potential, and ecotoxicity of fluorochemicals in the environment."

68.    In 1984, 3M's internal analyses confirmed that fluorochemicals were likely bioaccumulating in 3M's employees.

69.    Despite its understanding of the hazards associated with the PFAS in its products, 3M concealed the information it had and actively sought to suppress scientific research on the hazards associated with PFAS, mounting a campaign to control the scientific dialogue on the fate, exposure, analytics, and effects to human health and the ecological risks of PFAS.

70.    3M engaged in a variety of tactics to deceive others and to hide the negative effects of PFAS. For example, a former 3M employee disclosed that 3M, in a May 1998 report that it submitted to EPA, "chose to report simply that PFOS had been found in the blood of animals, which is true but omits the most significant information." And in 1999, Dr. Rich Purdy, a former environmental specialist with 3M, wrote a letter detailing, among other things (i) 3M's tactics to prevent research into the adverse effects of its PFOS, (ii) 3M's submission of misinformation about its PFOS to EPA, (iii) 3M's failure to disclose substantial risks associated with its PFOS to EPA, (iv) 3M's failure to inform the public of the widespread dispersal of its PFOS in the environment and population, (v) 3M's production of chemicals it knew posed an ecological risk and a danger to the food chain, and (vi) 3M's attempts to keep its workers from discussing the problems with the company's fluorochemical projects to prevent their discussions from being used in the legal process.

71.    Dr. Purdy described PFOS as "the most insidious pollutant since PCB [polychlorinated biphenyl]. It is probably more damaging than PCB because it does not degrade, whereas PCB does; it is more toxic to wildlife; and its sink in the environment appears to be biota and not soil and sediment, as is the case with PCB."

72.    Despite its knowledge of the risks associated with exposures to its PFAS products, when 3M announced in 2000 that it would phase out its PFOS, PFOA, and related products, it falsely asserted "our products are safe," instead of disclosing what it knew about the substantial threat posed by PFOS and PFOA.

19

73.     Even after it ceased manufacturing PFAS, 3M worked to control and distort the science on PFAS and the dangers that they presented to human health and the environment. For example, 3M provided millions of dollars in grants to a professor, John Giesy, who publicly presented himself as independent, but who behind the scenes actually worked for 3M. Mr. Giesy's goal, as expressed in a 2008 email, was to "keep 'bad' papers [regarding PFAS] out of the literature [because] otherwise in litigation situations they can be a large obstacle to refute."

74.     In fact, as recently as November 2018, 3M publicly stated that "the vast body of scientific evidence does not show that PFOS or PFOA cause adverse health effects in humans at current exposure levels, or even at the historically higher levels found in blood." And in 2019, 3M publicly claimed: "We do not believe that PFOS and PFOA cause harm to human health at levels that are typically found in the environment" and, "We do not believe there is a public health issue related to PFOA and PFOS." These statements contradict decades of research demonstrating the serious health and environmental effects of PFAS, including internal studies conducted by 3M's own scientists.

75.     Old DuPont began using PFOA in the 1950s, and only shortly thereafter developed an understanding of the dangers associated with PFAS.

76.     Old DuPont scientists issued internal warnings about the toxicity associated with its PFOA products as early as 1961, including that PFOA caused adverse liver reactions in rats and dogs. Old DuPont's Toxicology Section Chief opined that such products should be "handled with extreme care" and that contact with the skin should be "strictly avoided."

77.    By 1976, DuPont knew about research showing the presence of organic fluorine in blood bank samples in the United States, which the researchers thought could be a potential result of human exposure to PFOA.

78.    In 1978, based on information it received from 3M about elevated and persistent organic fluorine levels in workers exposed to PFOA, Old DuPont initiated a plan to review and monitor the health conditions of potentially exposed workers in order to assess whether any negative health effects were attributable to PFOA exposure. This monitoring plan involved obtaining blood samples from the workers and analyzing the samples for the presence of fluorine.

79.    By 1979, Old DuPont had data indicating that its workers exposed to PFOA had a significantly higher incidence of health issues than did unexposed workers. Old DuPont did not share these data or the results of its worker health analysis with the general public or government entities, including the State.

80.    The following year, Old DuPont internally confirmed, but did not make public, that PFOA "is toxic," that humans accumulate PFOA in their tissues, and that "continued exposure is not tolerable."

81.    Not only did Old DuPont know that PFOA accumulated in humans, it was also aware that PFOA could cross the placenta from an exposed mother to her gestational child. In 1981, Old DuPont conducted a blood sampling study of pregnant or recently pregnant employees. Of the eight women in the study who worked with fluoropolymers, two—or 25%—had children with birth defects in their eyes or face, and at least one had PFOA in the umbilical cord.

21

82.     Old DuPont reported to EPA in March 1982 that results from a rat study showed PFOA crossing the placenta if present in maternal blood, but it concealed the results of the study of its own plant workers, which revealed the same risk in humans.

83.     In addition to its knowledge of PFOA's toxicity danger, Old DuPont was also aware that PFAS were capable of contaminating the surrounding environment, leading to human exposure. Old DuPont was aware, no later than 1984, that PFOA is biopersistent.

84.     Old DuPont was long aware that the PFAS it was releasing from its facilities could leach into groundwater used for public drinking water. After obtaining data on these releases and the consequent contamination near Old DuPont's Washington Works plant in West Virginia, Old DuPont held a meeting at its corporate headquarters in Wilmington, Delaware in 1984 to discuss health and environmental issues related to PFOA. Old DuPont employees in attendance spoke of the PFOA issue as "one of corporate image, and corporate liability." They were resigned to Old DuPont's "incremental liability from this point on if we do nothing" because Old DuPont was "already liable for the past 32 years of operation." They also stated that the "legal and medical [departments within Old DuPont] will likely take the position of total elimination" of PFOA use in Old DuPont's business and that these departments had "no incentive to take any other position."

85.     As early as 1988, DuPont began treating PFOA internally as a possible human carcinogen.

86.     In 1999, DuPont received preliminary results from a monkey health study showing that PFOA caused monkeys to lose weight and increased their liver size. Even

monkeys given the lowest doses suffered liver enlargement, and one was so ill it had to be euthanized.

87. In 2000, John R. Bowman, a DuPont in-house counsel for PFOA issues, wrote an email to several colleagues: "I think we are more vulnerable than the MTBE defendants [manufacturers of another dangerous groundwater contaminant] because many states have adopted a drinking water guideline for MTBE and it is not biopersistent. My gut tells me the biopersistence issue will kill us because of an overwhelming public attitude that anything biopersistent is harmful."

88. In a 2001 email, DuPont in-house lawyer Bernard Reilly described DuPont's response to the PFOA or "C-8" issue as "a debacle at best." Reflecting on a late 2001 meeting with EPA concerning PFAS contamination in Parkersburg, West Virginia, Reilly wrote of DuPont: "[T]he business did not want to deal with this issue in the 1990s, and now it is in their face, and some still are clueless. Very poor leadership, the worst I have seen in the face of a serious issue since I have been with DuPont."

89. Notwithstanding its decades of internal knowledge of PFOA's health and environmental risks, DuPont publicly stated in 2003 that "[w]e are confident that there are no health effects associated with C-8 exposure," and that "C-8 is not a human health issue."

90. Old DuPont's own Epidemiology Review Board ("ERB") repeatedly raised concerns about Old DuPont's statements to the public that there were no adverse health effects associated with human exposure to PFOA. For example, in February 2006, the ERB "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis of [Old DuPont's] public expression

23

asserting, with what appears to be great confidence, that PFOA does not pose a risk to health." Contrary to ERB's advice, DuPont's chief medical officer issued a press release just months later, stating that "there are no health effects known to be caused by PFOA." An ERB member criticized the press release because it "appear[ed] written to leave the impression 'don't worry.'"

91.    In 2004, EPA filed an administrative enforcement action against Old DuPont based on its failure to disclose toxicity and exposure information for PFOA, in violation of the federal Toxic Substances Control Act ("TSCA") and Resource Conservation and Recovery Act ("RCRA"). Old DuPont eventually settled the lawsuit by agreeing to pay more than $16 million in civil administrative penalties and undertake supplemental environmental projects. EPA called the settlement the "largest civil administrative penalty EPA has ever obtained under any federal environmental statute."

92.    Despite its knowledge regarding PFOA's toxicity, Old DuPont continued to claim that PFOA posed no health risks and, in fact, chose to manufacture the chemical itself in or about 2002, after 3M's phased out its manufacture of the chemical.

**C.    Maryland's Affected Natural Resources.**

93.    Maryland law establishes the State's right and obligation to protect its natural resources. As set forth by the statutory sections below, the State is the steward of its environment.

94.    "The protection, preservation, and enhancement of the State's diverse environment is necessary for the maintenance of the public health and welfare and the

continued viability of the economy of the State and is a matter of the highest public priority." Md. Code Ann., Nat. Res. § 1-302(b).

95.   Pursuant to statute, "[e]ach person has a fundamental and inalienable right to a healthful environment[.]" *Id.* § 1-302(d).

96.   "Because the quality of the waters of this State is vital to the public and private interests of its citizens and because pollution constitutes a menace to public health and welfare, creates public nuisances, is harmful to wildlife, fish and aquatic life, and impairs domestic, agricultural, industrial, recreational, and other legitimate beneficial uses of water, and the problem of water pollution in this State is closely related to the problem of water pollution in adjoining states, it is State public policy to improve, conserve, and manage the quality of the waters of the State and to protect, maintain, and improve the quality of water for public supplies, propagation of wildlife, fish and aquatic life, and domestic, agricultural, industrial, recreational, and other legitimate beneficial uses." Env't § 4-402.

97.   The "quality of the waters of this State is vital to the interests of the citizens of this State[.]" *Id.* § 9-302. "[B]ecause pollution is a menace to public health and welfare, creates public nuisances, harms . . . and impairs domestic, agricultural . . . and other legitimate beneficial uses of water . . . it is the policy of this State: (1) To improve, conserve, and manage the quality of the waters of this State; (2) To protect, maintain, and improve the quality of water for public supplies . . . and (3) To provide that no waste is discharged into any waters of this State . . . to protect the legitimate beneficial uses of the waters of this State." *Id.*

25

98.     "The General Assembly determines and finds that lands and waters comprising the watersheds of the State are great natural assets and resources." *Id.* § 4-101.

99.     "It is the policy of the State of Maryland to: . . . (3) Protect the State's natural resources, including the fish and wildlife of the Potomac River, the Chesapeake Bay, and all other waters and waterways of the State." *Id.* § 5-5B-03.

100.    The "waters of the State" include both surface and underground waters within the boundaries of the State or subject to its jurisdiction. *See id.* § 5-101.

101.    "The General Assembly finds that nontidal wetlands play important roles in the preservation and protection of the Chesapeake Bay and other waters of the State." *Id.* § 5-902.

102.    "The General Assembly [also] declares that the Chesapeake Bay and the tidewater portions of its tributaries are a great natural asset and resource to the State and its counties." *Id.* § 5-1101(b).

103.    Under the Maryland Environmental Standing Act, the "General Assembly finds and declares that the natural resources . . . of the State of Maryland are in danger of irreparable harm occasioned by the use and exploitation of the physical environment. It further finds that improper use and exploitation constitute an invasion of the *right of every resident of Maryland to an environment free from pollution* to the extent possible. It further finds that the courts of the State of Maryland are an appropriate forum for seeking the protection of the environment and that an unreasonably strict procedural definition of 'standing to sue' in environmental matters is not in the public interest." Nat. Res. § 1-502 (emphasis added).

104.    PFAS contamination from PFAS Products has injured and continues to injure the waters and property of the State and the property, health, safety, and welfare of Maryland's citizens.

105.    The State owns lands throughout Maryland that it maintains for the benefit of the public, such as parks and wildlife management areas.

106.    The State holds its waters in trust for the State's citizens and has an obligation to protect public interests in these waters though, among other things, maintaining the environmental quality of its waters.

107.    The State's natural resources include its waters, such as springs, streams, wetlands, groundwater, ocean waters, and estuaries, within its boundaries or otherwise subject to its jurisdiction.

108.    Natural resources and State-owned properties have been injured by past and ongoing contamination caused by PFAS attributable to PFAS Products.

109.    PFAS have been found in groundwater, surface water, sediments, and soils throughout Maryland, and the State anticipates that additional PFAS contamination of natural resources will be uncovered as its investigation continues.

110.    PFAS contamination persists in the State's natural resources, i.e., it will not break down in the environment; damages their intrinsic, i.e., existence and passive use, value; and impairs the public benefits derived from access to, use, and enjoyment of the State's natural resources.

111.    The current and future residents of the State have a substantial interest in having natural resources uncontaminated by PFAS, as do the tourism, recreation, fishing,

27

and other industries that rely upon maintaining a clean environment for their businesses, patrons, and tourists to visit and enjoy.

### 1.     Groundwater

112.    Groundwater is a critical and finite ecological natural resource for the people of the State, as the State relies on groundwater for drinking, irrigation, and agriculture.

113.    Maryland relies on groundwater for drinking water supplies.  Groundwater is the most commonly used source of water supply, and some regions of the State (Southern Maryland and the Eastern Shore) rely exclusively on groundwater for their water needs. That is nearly 3,153 of the State's 3,242 public water systems rely exclusively on groundwater.

114.    In addition to serving as a source of water for drinking, agriculture, and other uses, groundwater is an integral part of the overall ecosystem in the State.  Groundwater provides base flow to streams and influences surface water quality, wetland ecological conditions, and the health of aquatic ecosystems.  Groundwater also keeps water in rivers during times of drought.

115.    Groundwater promotes the movement of water and nutrients within and among the State's bodies of water and wetlands, prevents saltwater intrusion, provides groundwater stabilization, and helps to maintain critical water levels in freshwater wetlands.

116.    Groundwater and the State's other natural resources are unique resources that help sustain the State's economy.

117.    PFAS contamination mobilizes in and through groundwater sources to reach areas beyond the initial source of contamination.  This contamination adversely affects the groundwater.

118.    The State's investigation has revealed elevated levels of PFAS in groundwater and specifically in potable groundwater.

119.    The State's investigation of contamination from PFAS Products in groundwater in Maryland is ongoing.

**2.    Surface Water**

120.    Surface water is a critical ecological resource of the State.  Approximately 10% of the Community Water Systems (around 50 systems) in Maryland rely on surface water, yet these surface water systems serve about 80% of the population *using public water systems*.

121.    Surface water in Maryland is also used for recreational, industrial, agricultural, and other commercial purposes.  Specific uses include swimming, boating, and recreational fishing and crabbing, commercial fishing and crabbing, and oyster farming.

122.    Surface water also provides aesthetic and ecological values, including supporting aquatic ecosystems, nearby communities, and the residents of the State.

123.    PFAS are mobile and persistent in water and can spread great distances from the point of discharge.  PFAS contamination has reached and adversely affected surface water throughout the State.

124.    Investigation of contamination from PFAS Products in the State is ongoing.

29

### 3.    Coastal Resources and Estuaries

125.    Maryland has over 3,000 miles of shoreline, most of which is along Chesapeake Bay and its tidal tributaries and the Atlantic Ocean.

126.    Chesapeake Bay is the largest estuary in the United States.  Estuaries are partially enclosed bodies of water surrounding coastal habitats where saltwater from the ocean mixes with fresh water from rivers and streams within the State.  They provide habitat for many kinds of marine life and commercially important species including striped bass, blue crabs, and oysters.

127.    PFAS have contaminated estuaries and surrounding lands.  These coastal habitats and estuaries are some of the most imperiled marine habitats due to the contamination caused by PFAS and they serve as long-term reservoirs of PFAS, where PFAS are stored and released over time, impacting the estuaries and increasing PFAS concentrations in the cells and tissues of the shellfish and other wildlife that people eat.

128.    The State is continuing its investigation of contamination from PFAS Products in the coastal areas, estuaries, and surrounding lands in the State.

### 4.    Sediments, Soils, and Submerged Land

129.    Given the nature of PFAS contamination, the State believes that widespread contamination of sediments, soils, and submerged lands exists in Maryland.  Investigation of contamination from PFAS Products in sediments, soils, and submerged lands in the State is ongoing.

130.    PFAS contamination in the State has reached and adversely affected soil and sediment throughout the State.  Additionally, PFAS in the soil column serve as a continuing

source of contamination of groundwater and other resources of the State. PFAS in sediments, as well as in surface water, support the potential increase of PFAS concentrations in fish.

**5.    Biota**

131.    Biota, including the State's flora and fauna, are critical ecological resources.

132.    PFAS contamination threatens animal and plant species because PFAS can cause damage to the liver and immune system of animals and has been shown to damage cell structure and organelle functions in plants.

133.    Natural resource injuries to biota in the State negatively impact not only the individual species directly involved, but also the capacity of the injured ecosystems to regenerate and sustain life into the future.

134.    PFAS contamination has reached and adversely affected biota in the State. The State's investigation of contamination from PFAS Products in biota in Maryland is ongoing.

**D.    Defendants' PFAS Products Have Contaminated the State's Natural Resources, Including Sources of Drinking Water, and Defendants Are Liable for Costs to Remediate and Restore Those Resources.**

135.    The State's natural resources have been contaminated with PFAS from Defendants' PFAS Products as a result of Defendants' acts and omissions. Defendants' manufacturing, marketing, and sale of PFAS have introduced these chemicals into the environment and caused the contamination of the State's groundwater, surface water, drinking water, and other resources, and exposed the State's citizens to substantial health risks.

136. The State's investigation of this contamination source is continuing. Investigation is necessary to ascertain the full scope of this contamination and to return the natural resources impacted to levels that are safe for human health and the environment and to the condition in which they existed prior to the impact of these contaminants.

137. Defendants are liable for the cost of investigation, remediation, and restoration of all the property, soils, sediments, waters, and other natural resources contaminated with their PFAS, as well as for the State's loss of past, present, and future uses of such contaminated natural resources.

138. Most critically, PFAS contamination of groundwater and surface water is impacting the State's drinking water sources. Defendants are liable for all of the costs necessary to investigate and treat in perpetuity any and all drinking water wells and sources of drinking water impacted by their PFAS.

139. In late 2019, MDE began to increase its efforts to better understand, communicate, and manage PFAS risks in Maryland through the implementation of a multi-phased approach to assessing PFAS in drinking water sources across the State. MDE collected over 1,000 drinking water samples from 431 federally-regulated community water systems, which are water systems that deliver drinking water to the same customers throughout the year.

140. During Phase 1 of the MDE study, conducted from September 2020 to February 2021, samples of finished water were collected from 129 water treatment plants and were tested for PFAS under EPA Method 537.1 by the Maryland Department of Health Laboratories Administration. "Finished water" is water that has passed through a water

treatment plant and that has undergone all treatment processes. The 129 water treatment plants sampled during Phase 1 serve 59 community water systems and provide drinking water to 4.3 million people, approximately 70% of Maryland's population.

141.  For Phase 1, a total of 131 initial finished water samples were collected from the 129 water treatment plants. Of the 131 initial finished water samples analyzed:

- 98 samples (~75%) measured quantifiable levels of PFOA+PFOS in finished water;

- 2 samples (~1.5%) measured PFOA+PFOS greater than 70 ppt (i.e., the 2016 the EPA health advisory limit for PFOA+PFOS);

- 2 samples (~1.5%) measured PFOA+PFOS between 35 ppt and 70 ppt; and

- 23 samples (~17%) measured PFOA+PFOS levels between 10 ppt and 35 ppt.

142.  If results for initial finished water samples measured PFOA+PFOS concentrations greater than the EPA's health advisory limit of 70 ppt, then MDE asked the affected community water system to take its water treatment plant immediately out of service until additional sample collection and treatment implementation could be conducted.

143.  Phase 2 of MDE's study, which was conducted from March 2021 through May 2021, focused on the collection and testing of drinking water sources that were identified as potentially being at a higher relative risk for PFAS contamination, including whether the source of the drinking water was from surface water or groundwater in unconfined or semi-confined aquifers and the frequency a water system's customers

33

receive their drinking water, i.e., customers receiving water from the same community water systems every day.

144.    Under Phase 2, 167 samples were collected from 65 community water systems. Those 65 systems represent approximately 14% of Maryland's federally-regulated community water systems and provide drinking water to approximately 81,000 people (or about 1.3% of Maryland's population).

145.    Of the 167 samples of groundwater, 141 were withdrawn from an unconfined or semi-confined aquifer. MDE focused on unconfined or semi-confined aquifers because, unlike confined aquifers, they are not "confined" by layers of clay that protect the aquifer from external pollutants, including PFAS, making these the most vulnerable sources of drinking water.

146.    In addition, the vast majority of those 141 samples were taken from untreated groundwater; whereas only 4 were taken at the entrance to the distribution system.

147.    Of the 137 initial groundwater samples withdrawing from an unconfined or semi-confined aquifer (excluding 4 initial point of entry samples):

- 71 samples (~51.82%) measured quantifiable levels of PFOA+PFOS;

- 1 sample (~0.73%) measured quantifiable levels of PFOA+PFOS between 35 and 70 ppt;

- 1 sample (0.73%) measured quantifiable levels of PFOA+PFOS between 28 and 35 ppt;

- 13 samples (9.49%) measured quantifiable levels of PFOA+PFOS between 10 and 28 ppt; and

- 56 samples (40.88%) had detectable levels of PFOA+PFOS below 10 ppt.

148. Between the sampling conducted under phases 1 and 2, MDE has tested drinking water for PFAS in water that is provided to more than 70% of the population of Maryland.

149. In August 2021, MDE initiated the third phase of its public water sampling study to evaluate the occurrence of PFAS in drinking water.

150. During this phase, 759 drinking water samples were collected and tested. Samples collected under Phase 3 consisted of both finished and untreated water from a variety of groundwater sources withdrawing from confined, semi-confined, and unconfined aquifers, springs, and one surface water source.

151. The Phase 3 results detected PFOA in 70% of the samples of unconfined groundwater and in 63% of the samples of semi-confined groundwater. PFOS was detected in 64% of the unconfined groundwater samples and in 38% of the semi-confined groundwater samples. Spring water also had high levels of PFOA and PFOS.

152. In November 2022, MDE completed a fourth phase of sampling focused on previously sampled systems that had detected PFOA and PFOS in drinking water. MDE collected 228 samples from 126 resampled community water systems. The samples are currently being analyzed.

153. In addition to testing its drinking water to identify PFAS impacts, MDE is also in the process of testing wastewater in municipal wastewater treatment plants to identify impacts from PFAS Products.

154.    The Maryland Department of Agriculture is also required to study the use of PFAS in pesticides in the State and report the results of its study to the Governor and the General Assembly by November 2023.

**E.    Maryland's Prohibition of PFAS Products.**

155.    Maryland has already acted to ban the intentional inclusion of PFAS in certain products to which its citizens are exposed.

156.    Under § 9-1902(d) of the Environment Article, "[o]n or after January 1, 2024, a manufacturer or distributor may not manufacture or knowingly sell, offer for sale, or distribute for sale or use in the State a food package or food packaging component designed and intended for direct food contact to which PFAS chemicals were intentionally added."

157.    Additionally, "[o]n or after January 1, 2024, a person may not manufacture or knowingly sell, offer for sale, or distribute for sale or use in the State a rug or carpet to which PFAS chemicals have been intentionally added." Env't § 6-1604.1(b).

**F.    Old DuPont's Multi-Step, Years-Long Fraudulent Scheme to Isolate Its Valuable Tangible Assets from Its PFAS Liabilities and Hinder Creditors.**

158.    As EPA, states, and private plaintiffs became aware of the hazards presented by PFAS, Old DuPont, beginning in or about 2013 and continuing through at least June 2019, planned and executed a series of corporate restructurings designed to separate its valuable assets from its billions of dollars of legacy environmental liabilities, especially those arising from PFOA and other PFAS contamination.

159.    Old DuPont's potential cumulative liability related to PFOA and other PFAS likely amounts to billions of dollars due to the persistence, mobility, bioaccumulative

properties, and toxicity of these "forever" compounds, as well as Old DuPont's decades-long attempt to hide the dangers of PFAS from the public.

160. For more than five decades, Old DuPont manufactured, produced, or utilized PFOA and other PFAS at plants in New Jersey, West Virginia, and North Carolina, among others. As alleged above, throughout this time, Old DuPont was aware that PFOA was toxic, harmful to animals and humans, bioaccumulative, and persistent in the environment. Old DuPont also knew that it had emitted and discharged PFOA and other PFAS in large quantities into the environment and that scores of people had been exposed to PFOA, including through public and private drinking water supplies, like those in Maryland, which Old DuPont had contaminated. Thus, Old DuPont knew, or reasonably should have known, that it faced billions of dollars in liabilities arising from its use of PFAS.

161. Beginning at least in 1999 and continuing to the present, Old DuPont has faced mounting litigation arising from its historic manufacture, production and use of PFAS. In 1999, members of the Tennant family, who owned property affected by contamination from a landfill that had accepted PFOA wastes from Old DuPont's nearby Washington Works plant, sued Old DuPont in West Virginia federal court.

162. Old DuPont's in-house counsel were very concerned about Old DuPont's exposure to liability related to PFOA. In November 2000, one of Old DuPont's in-house lawyers handling PFOA issues wrote to his co-counsel: "We are going to spend millions to defend these lawsuits and have the additional threat of punitive damages hanging over our head. Getting out in front and acting responsibly can undercut and reduce the potential for punitives . . . . Our story is not a good one, we continued to increase our emissions into

the river in spite of internal commitments to reduce or eliminate the release of this chemical into the community and the environment because of our concern about the biopersistence of this chemical."

163.    In 2005, after settling the Tennant case, Old DuPont settled claims brought by EPA for violations of TSCA and RCRA related to its failure to disclose toxicity and exposure information for PFOA, as discussed in ¶ 91.

164.    Also in 2005, a West Virginia court entered a final order approving a 2004 settlement of a class action lawsuit filed against Old DuPont on behalf of 70,000 Ohio and West Virginia residents who had been exposed to PFOA that Old DuPont had discharged from Washington Works.

165.    Under the terms of the settlement, which provided class benefits in excess of $300 million, Old DuPont agreed to fund a panel of scientists (the "Science Panel") to confirm which diseases were linked to PFOA exposure, to filter local water from impacted public and private drinking water supplies, and to pay up to $235 million for medical monitoring of the affected community for any diseases that the Science Panel linked to PFOA exposure.  The settlement also provided that any class members who developed the diseases linked by the Science Panel would be entitled to sue for personal injury, and Old DuPont agreed not to contest the fact that the class members' exposure to PFOA could cause each of the linked diseases.

166.    By 2012, after seven years of studies, the Science Panel confirmed "probable links" between exposure to PFOA and the following serious human diseases: medically

diagnosed high cholesterol, ulcerative colitis, pregnancy induced hypertension, thyroid disease, testicular cancer, and kidney cancer.

167.    After the Science Panel confirmed such probable links with human disease, more than 3,500 personal injury claims were filed against Old DuPont in Ohio and West Virginia by class members with one or more of those linked diseases under the terms of the 2005 class settlement.  In 2013, these claims were consolidated in federal multidistrict litigation styled *In Re: E. I. du Pont de Nemours and Company C-8 Personal Injury Litigation* (MDL No. 2433) in the U.S. District Court for the Southern District of Ohio (the "Ohio MDL").  Forty bellwether trials were scheduled to take place in 2015 and 2016.

168.    The first three trials in the Ohio MDL ended in plaintiffs' verdicts. Each jury awarded damages in a larger amount than the one before it: the first awarded $1.6 million; the second awarded $5.6 million; and the third awarded $12.5 million.  The second and third jury awards included punitive damages.  Old DuPont then settled the remaining, pending claims for $670.7 million dollars.

169.    Old DuPont knew or should have known that it faced substantial exposure at these trials, as well as liability related to PFOA and other PFAS contamination caused by its manufacturing operations at other sites throughout the country, its releases and disposal of PFAS chemicals globally, and for toxic PFAS chemicals in its own products and the myriad products into which its toxic PFAS were incorporated, and that its liability likely measured in the billions of dollars.

170.    Anticipating this significant liability exposure, Old DuPont convened an internal initiative known as "Project Beta" in or about 2013 for Old DuPont's management

39

to consider restructuring the company in order to, among other things, avoid responsibility for the widespread environmental harm that Old DuPont's PFAS had caused and shield billions of dollars in assets from these substantial liabilities.

171.   In furtherance of possible restructuring opportunities, including potential mergers, Old DuPont and The Dow Chemical Company ("Old Dow") began to discuss a possible "merger of equals" in or about 2013.

172.   However, neither Old Dow nor any other rational merger partner would agree to a transaction that would result in exposing it to the substantial PFAS and environmental liabilities that Old DuPont faced.

173.   Accordingly, Old DuPont's management decided to pursue a multi-year corporate restructuring specifically orchestrated to isolate Old DuPont's massive legacy liabilities from its valuable tangible assets in an attempt to shield those assets from creditors and entice Old Dow to pursue the proposed merger.

174.   Old DuPont engaged in a coordinated three-part restructuring plan that consisted of (i) Old DuPont's attempt to cast off its massive environmental liabilities onto Chemours and spinning off Chemours as a separate publicly-traded company, (ii) the creation of New DuPont to facilitate a purported merger with Old Dow, and (iii) a series of internal restructurings and divestitures that culminated with the spinoff of Old DuPont to its newly-formed parent, Corteva.

175.   The first step in Old DuPont's fraudulent scheme was to transfer its performance chemicals business, which included Teflon and other products ("Performance Chemicals Business"), into its wholly-owned subsidiary, Chemours. Then, in July 2015,

Old DuPont "spun-off" Chemours as a separate public entity and saddled Chemours with Old DuPont's massive legacy liabilities (the "Chemours Spinoff").

176.    Old DuPont knew that Chemours was undercapitalized and could not satisfy the massive liabilities that it caused Chemours to assume. Old DuPont also knew that the Chemours Spinoff alone would not insulate its own assets from its PFAS liabilities as Old DuPont still faced direct liability for its own conduct.

177.    The second step in the scheme involved Old DuPont and Old Dow entering into an "Agreement and Plan of Merger" in December 2015, pursuant to which Old DuPont and Old Dow merged with subsidiaries of a newly-formed holding company, DowDuPont, Inc. ("DowDuPont"), which was created for the sole purpose of effectuating the merger. Old DuPont and Old Dow became subsidiaries of DowDuPont.

178.    In the third step, DowDuPont engaged in numerous business segment and product line "realignments" and "divestitures," which culminated in DowDuPont spinning off two new publicly-traded companies: (i) Corteva, which currently holds Old DuPont as a subsidiary, and (ii) Dow, Inc. ("New Dow"), which currently holds Old Dow. DowDuPont was then renamed DuPont de Nemours, Inc., i.e., New DuPont.

179.    Old DuPont's restructuring, beginning with the spinoff of Chemours in 2015, and ending with the spinoff of Corteva on June 1, 2019, was designed to separate Old DuPont's massive historic PFAS liabilities from its valuable, non-PFAS assets and thereby hinder, delay, and defraud creditors.

41

180.    As a result of this restructuring, between December 2014, i.e., before the Chemours Spinoff, and December 2019, i.e., after the Dow merger, the value of Old DuPont's tangible assets decreased by $20.85 billion, or by approximately one-half.

181.    New DuPont and Corteva now hold a significant portion of the tangible assets that Old DuPont formerly owned.

182.    Many of the details about these transactions are hidden from the public in confidential schedules and exhibits to the various restructuring agreements. Old DuPont, New DuPont, and Corteva likely intentionally have acted to hide from creditors the details about where Old DuPont's valuable assets went and the inadequate consideration that Old DuPont received in return.

183.    The below graphic depicts the restructuring as it progressed through each of the three steps:



184. In greater detail, the restructuring scheme was implemented as follows.

**1.    Step 1: The Chemours Spinoff**

185. In February 2014, Old DuPont formed Chemours as a wholly-owned subsidiary.

186. On April 30, 2015, Chemours was converted from a limited liability company to a corporation named "The Chemours Company."

187. On July 1, 2015, Old DuPont completed the spinoff of Chemours, and Chemours became a separate, publicly-traded entity.

188. At the time of the spinoff, the Performance Chemicals Business consisted of Old DuPont's Titanium Technologies, Chemical Solutions, and Fluoroproducts segments, including business units that had manufactured, used, and discharged PFOA into the environment.

189. Prior to the spinoff, Chemours's Board of Directors was dominated by Old DuPont employees. As a result, during the period of time that the terms of its separation from Old DuPont were being negotiated, Chemours did not have an independent Board of Directors or management independent of Old DuPont.

190. To effectuate the Chemours Spinoff, Old DuPont and Chemours entered into a June 26, 2015 Separation Agreement (the "Chemours Separation Agreement").

191. Pursuant to the Chemours Separation Agreement, Old DuPont agreed to transfer to Chemours all businesses and assets related to the Performance Chemicals Business, including 37 active chemical plants.

43

192.    At the same time, Chemours accepted a broad assumption of Old DuPont's massive liabilities relating to Old DuPont's Performance Chemicals Business. The specific details regarding the nature and value of probable maximum loss and the anticipated timing of the liabilities that Chemours assumed are set forth in the nonpublic schedules and exhibits to the Chemours Separation Agreement.

193.    Notwithstanding the billions of dollars in environmental and PFAS liabilities that Chemours would face, on July 1, 2015, Old DuPont caused Chemours to transfer to Old DuPont approximately $3.4 billion as a cash dividend, along with a "distribution in kind" of promissory notes with an aggregate principal amount of $507 million.

194.    Thus, in total, Chemours distributed approximately $3.9 billion to Old DuPont. Old DuPont required Chemours to fund these distributions through financing transactions, including senior secured term loans and senior unsecured notes totaling approximately $3.995 billion entered into on May 12, 2015. Additionally, Chemours distributed approximately $3 billion in common stock to Old DuPont's shareholders on July 1, 2015 (181 million shares at $16.51 per share price).

195.    Accordingly, most of the valuable assets that Chemours may have had at the time of the Chemours Spinoff were unavailable to creditors with current or future PFAS claims, like those of the State, and Old DuPont stripped Chemours's value for itself and its shareholders.    Old DuPont, however, only transferred $4.1 billion in net assets to Chemours.

196.    In addition to requiring Chemours to assume billions of dollars of Old DuPont's PFAS liabilities, the Chemours Separation Agreement includes an

indemnification of Old DuPont in connection with those liabilities, which is uncapped and does not have a survival period.

197.    Specifically, the Chemours Separation Agreement requires Chemours to indemnify Old DuPont against, and assume for itself, all "Chemours Liabilities," which are defined broadly to include, among other things, "any and all Liabilities relating . . . primarily to, arising primarily out of or resulting primarily from, the operation or conduct of the Chemours Business, as conducted at any time prior to, at or after the Effective Date . . . including . . . any and all Chemours Assumed Environmental Liabilities," which includes Old DuPont's historic liabilities relating to and arising from its decades of emitting pollution, including PFOA, into the environment from its dozens of facilities.

198.    Under the Chemours Separation Agreement, Chemours must indemnify Old DuPont against, and assume for itself, the Chemours Liabilities regardless of (i) when or where such liabilities arose; (ii) whether the facts upon which they are based occurred prior to, on, or subsequent to the effective date of the spinoff; (iii) where or against whom such liabilities are asserted or determined; (iv) whether arising from or alleged to arise from negligence, gross negligence, recklessness, violation of law, fraud, or misrepresentation by any member of the Old DuPont group or the Chemours group; (v) the accuracy of the maximum probable loss values assigned to such liabilities; and (vi) which entity is named in any action associated with any liability.

199.    The Chemours Separation Agreement also requires Chemours to indemnify Old DuPont from, and assume all, environmental liabilities that arose prior to the Chemours Spinoff if they were "primarily associated" with the Performance Chemicals Business.

45

200.    In addition, Chemours agreed to use its best efforts to be fully substituted for Old DuPont with respect to "any order, decree, judgment, agreement or Action with respect to Chemours Assumed Environmental Liabilities."

201.    There was no meaningful, arms-length negotiation of the Chemours Separation Agreement and Old DuPont largely dictated its terms.

202.    The Chemours Spinoff was so one-sided that Chemours, in May 2019, sued Old DuPont, New DuPont, and Corteva in Delaware Chancery Court. *See The Chemours Company v. DowDuPont, et al.*, C.A. No. 2019-0351 (Del. Ch. Ct., filed May 13, 2019).

203.    In its Amended Complaint, which was verified by Chemours's current Chief Executive Officer Mark Newman, Chemours alleged that the primary motivation for the Chemours Spinoff, the subsequent creation of New DuPont, and the final separation of Corteva was to enable Old DuPont to "wash its hands of its environmental liabilities."

204.    Chemours also alleged, among other things, that if (i) the full value of Old DuPont's PFAS and environmental liabilities was properly estimated and (ii) the Delaware court did not limit the liability that the Chemours Separation Agreement imposed on it, then Chemours would have been insolvent at the time it was spun off from Old DuPont.

205.    Chemours alleged that Old DuPont refused to allow any procedural protections for Chemours in the negotiations, and Old DuPont and its outside counsel prepared all the documents to effectuate the Chemours Spinoff. Indeed, during the period in which the terms of commercial agreements between Chemours and Old DuPont were negotiated, Chemours did not have an independent board of directors or management independent of Old DuPont.

206.    Old DuPont's apparent goal with respect to the Chemours Spinoff was to segregate a large portion of Old DuPont's legacy environmental liabilities, including liabilities related to its PFAS chemicals and products, and in so doing, shield Old DuPont.

207.    Given Old DuPont's extraction of nearly $4 billion from Chemours immediately prior to the Chemours Spinoff, Chemours was thinly capitalized and unable to satisfy the substantial liabilities that it assumed from Old DuPont. Chemours notably disclosed in public filings with the U.S. Securities and Exchange Commission ("SEC") that its "significant indebtedness" arising from its separation from Old DuPont restricted its current and future operations.

208.    Shortly after the Chemours Spinoff, market analysts described Chemours as "a bankruptcy waiting to happen" and a company "purposely designed for bankruptcy."

209.    At the end of December 2014, Chemours reported it had total assets of $5.959 billion and total liabilities of $2.286 billion. At the end of 2015, following the Chemours Spinoff, Chemours reported that it had total assets of $6.298 billion and total liabilities of $6.168 billion, yielding a total net worth of $130 million.

210.    For the year 2015, Chemours reported $454 million in "other accrued liabilities," which in turn included $11 million for accrued litigation and $68 million for environmental remediation. Chemours separately reported $553 million in "other liabilities," which included an additional $223 million for environmental remediation and $58 million for accrued litigation.

211.    Chemours significantly underestimated its liabilities, including the liabilities that it had assumed from Old DuPont with respect to PFAS, which Old DuPont and

Chemours knew or should have known would be billions of dollars in addition to other environmental liabilities for other contaminants discharged at Old DuPont and Chemours facilities.

212. For example, in 2017, Chemours and Old DuPont amended the Chemours Separation Agreement in connection with the settlement of the personal injury multidistrict litigation brought by thousands of residents who had been exposed to PFOA from Old DuPont's Washington Works plant. Per the amendment, Chemours paid $320.35 million to the plaintiffs in the settlement on August 21, 2017, and Old DuPont paid an additional $320.35 million on September 1, 2017.

213. Had the full extent of Old DuPont's legacy liabilities been taken into account, as it should have been at the time of the Chemours Spinoff, Chemours would have had negative equity (that is, total liabilities greater than total assets), not only on a tangible basis, but also on a total equity basis, and Chemours would have been rendered insolvent at that time.

**2. Step 2: The Old Dow/Old DuPont "Merger"**

214. After the Chemours Spinoff, Old DuPont took the position that it was somehow no longer responsible for the widespread PFAS contamination that it had caused over several decades.

215. Old DuPont could not contractually discharge all of its historical liabilities through the Chemours Spinoff, however, and Old DuPont remained liable for the liabilities it had caused and Chemours had assumed.

216.    Old DuPont knew that it could not escape liability and would still face exposure for PFAS liabilities, including for potentially massive punitive damages. So Old DuPont moved to the next phase of its fraudulent scheme.

217.    On December 11, 2015, less than six months after the Chemours Spinoff, Old DuPont and Old Dow announced that their respective boards had approved an agreement "under which the companies [would] combine in an all-stock merger of equals" and that the combined company would be named DowDuPont, Inc. (the "Dow-DuPont Merger"). The companies disclosed that they intended to separate the combined companies' businesses into three publicly-traded companies through further spinoffs, each of which would occur 18-to-24 months following the closing of the merger.

218.    To effectuate the transaction, Old DuPont and Old Dow entered into an Agreement and Plan of Merger (the "Dow-DuPont Merger Agreement") that provided for (i) the formation of a new holding company Diamond-Orion HoldCo, Inc., later named DowDuPont, and then renamed DuPont de Nemours, Inc., i.e., New DuPont, and (ii) the creation of two new merger subsidiaries into which Old Dow and Old DuPont each would merge.

219.    Thus, as a result of the merger, and in accordance with the DowDuPont Merger Agreement, Old Dow and Old DuPont each became wholly-owned subsidiaries of DowDuPont.

220.    Although Old DuPont and Old Dow referred to the transaction as a "merger of equals," the two companies did not actually merge at all, likely because doing so would have infected Old Dow with all of Old DuPont's historical PFAS liabilities. Rather, Old

49

DuPont and Old Dow became affiliated sister companies that were each owned by the newly-formed DowDuPont. DowDuPont was aware of Old DuPont's historical PFAS liabilities.

221.   The corporate organization following the "merger" is depicted under "Step 2" in the graphic depicted in ¶ 183.

### 3.   Step 3: The Shuffling, Reorganization, and Transfer of Valuable Assets Away from Old DuPont and Separation of Corteva and New Dow

222.   Following the Dow-DuPont Merger, DowDuPont underwent a significant internal reorganization and engaged in numerous business segment and product line "realignments" and "divestitures." The net effect of these transactions has been the transfer, either directly or indirectly, of a substantial portion of Old DuPont's assets out of the company.

223.   The transactions were intended further to frustrate and hinder creditors with claims against Old DuPont, including with respect to its substantial environmental and PFAS liabilities.

224.   Old DuPont's assets, including its remaining business segments and product lines, were transferred either directly or indirectly to DowDuPont, which reshuffled the assets and combined them with the assets of Old Dow, and then reorganized the combined assets into three distinct divisions: (i) the "Agriculture Business," (ii) the "Specialty Products Business," and (iii) the "Materials Science Business."

225.   While the precise composition of these divisions, including many details of the specific transactions, the transfer of business segments, and the divestiture of product

lines during this time, are not publicly available, Old DuPont apparently transferred a substantial portion of its valuable assets to DowDuPont, for far less than the assets were worth.

226.   Once the assets of Old DuPont and Old Dow were combined and reorganized, DowDuPont incorporated two new companies to hold two of the three newly-formed business lines: (i) Corteva, which became the parent holding company of Old DuPont, which in turn holds the Agriculture Business, and (ii) New Dow, which became the parent holding company of Old Dow, and which holds the Materials Science Business. DowDuPont retained the Specialty Products Business and prepared to spin off Corteva and New Dow into separate, publicly-traded companies.

227.   The below graphic depicts the structure of DowDuPont after the internal reorganization and realignment (and notes the planned disposition of the new companies):



228.    The mechanics of the separations are governed by the April 1, 2019 Separation and Distribution Agreement among Corteva, New Dow, and DowDuPont (the "DowDuPont Separation Agreement").

229.    The DowDuPont Separation Agreement generally allocates the assets primarily related to the respective business divisions to Corteva (Agriculture Business), New Dow (Materials Science Business), and New DuPont (Specialty Products Business). New DuPont also retained several "non-core" business segments and product lines that once belonged to Old DuPont.

230.    Similarly, Corteva, New Dow, and New DuPont each retained the liabilities primarily related to the business divisions that they retained. In particular, (i) Corteva retained and assumed the liabilities related to the Agriculture Business, (ii) New DuPont retained and assumed the liabilities related to the Specialty Products Business, and (iii) New Dow retained and assumed the liabilities related to the Materials Science Business.

231.    Corteva and New DuPont also assumed direct financial liability of Old DuPont that was not related to the Agriculture, Materials Science, or Specialty Products Businesses, including its PFAS liabilities. These assumed PFAS liabilities are allocated between Corteva and New DuPont pursuant to the DowDuPont Separation Agreement.

232.    This "allocation" applies to Old DuPont's legacy liabilities for PFAS contamination and its former Performance Chemicals Business, including the State's claims in this case.

233.    While New DuPont and Corteva have buried the details in nonpublic schedules, New DuPont and Corteva each assumed these liabilities under the DowDuPont

Separation Agreement, along with other liabilities related to Old DuPont's discontinued and divested businesses. The State can therefore bring claims against New DuPont and Corteva directly for Old DuPont's contamination of and damage to the State's natural resources.

234. The separation of New Dow was completed on or about April 1, 2019, when DowDuPont distributed all of New Dow's common stock to DowDuPont stockholders as a pro rata dividend.

235. DowDuPont then consolidated the Agricultural Business line into Old DuPont and "contributed" Old DuPont to Corteva.

236. On June 1, 2019, DowDuPont spun off Corteva as an independent public company, when DowDuPont distributed all of Corteva's common stock to DowDuPont stockholders as a pro rata dividend.

237. Corteva now holds 100% of the outstanding common stock of Old DuPont.

238. The corporate structures of New DuPont, New Dow and Old Dow, and Corteva and Old DuPont, respectively, following the separations are depicted in Step 3 of the graphic in ¶ 183.

239. Also, on or about June 1, 2019, DowDuPont changed its registered name to DuPont de Nemours, Inc., i.e., New DuPont.

240. On or about January 1, 2023, Old DuPont changed its registered name to EIDP, Inc.

**G.     The Effect of the Years-Long Conspiracy to Defraud the State and Other Creditors and Avoid Financial Responsibility for Legacy Liabilities.**

241.    The net result of these transactions, including the June 1, 2019, Corteva spinoff, was to strip away valuable tangible assets from Old DuPont and transfer those assets to New DuPont and Corteva for far less than the assets are worth.

242.    Old DuPont estimated that the Dow-DuPont Merger created "goodwill" worth billions of dollars. When the Corteva separation was complete, a portion of this "goodwill" was assigned to Old DuPont in order to prop up its balance sheet. But in reality, Old DuPont was left with substantially fewer tangible assets than it had prior to the restructuring.

243.    In addition, Old DuPont owes a debt to Corteva of approximately $4 billion. SEC filings demonstrate the substantial deterioration of Old DuPont's finances and the drastic change in its financial condition before and after the above transactions.

244.    For example, for the fiscal year ending 2014, prior to the Chemours Spinoff, Old DuPont reported $3.6 billion in net income and $3.7 billion in cash provided by operating activities. For the 2019 fiscal year, just months after the Corteva separation, however, Old DuPont reported a net loss of $1 billion and only $996 million in cash provided by operating activities. That is a decrease of 128% in net income and a decrease of 73% in annual operating cash flow.

245.    Additionally, Old DuPont reported a significant decrease in Income from Continuing Operations Before Income Taxes (also known as Earnings Before Tax, or "EBT"). Old DuPont reported $4.9 billion in EBT for the period ending December 31, 2014. For the period ending December 31, 2019, Old DuPont reported EBT of negative $422 million.

246. Also, for the fiscal year ending in 2014, prior to the Chemours Spinoff, Old DuPont owned nearly $41 billion in tangible assets. For the fiscal year ended 2019, Old DuPont owned just under $21 billion in tangible assets.

247. That means in the five-year period over which the restructuring occurred, when Old DuPont knew that it faced billions of dollars in environmental and PFAS liabilities, Old DuPont transferred or divested approximately half of its tangible assets, totaling $20 billion.

248. As of September 2019, just after the Corteva spinoff, Old DuPont reported $43.251 billion in assets. But almost $21.835 billion of these assets were comprised of intangible assets, including "goodwill" from its successive restructuring activities.

249. At the same time, Old DuPont reported liabilities totaling $22.060 billion. Thus, when the Corteva spinoff was complete, Old DuPont's tangible net worth, excluding its intangible assets, was negative $644 million.

250. In addition, neither New DuPont nor Corteva has publicly conceded that they assumed Old DuPont's historical environmental and PFAS liabilities. And it is unclear whether either entity will be able to satisfy future judgments.

251. Indeed, New DuPont, to which PFAS liabilities are allocated under the DowDuPont Separation Agreement, has divested numerous business segments and product lines, including tangible assets that it received from Old DuPont and for which Old DuPont has received less than reasonably equivalent value and is in the process of divesting more.

252. Old DuPont's parent holding company, Corteva, to which PFAS liabilities are also allocated under the DowDuPont Separation Agreement once certain conditions are

satisfied holds as its primary tangible asset the intercompany debt owed to it by its wholly-owned subsidiary, Old DuPont. But Old DuPont does not have sufficient tangible assets to satisfy this debt obligation.

253.     The Chemours Spinoff, the Dow-DuPont Merger, and the final separation of Corteva were part of a single coordinated fraudulent scheme to hinder, delay, and defraud Old DuPont's creditors. The Chemours Spinoff constitutes a fraudulent transfer, which entitles the State , among other things, to void the transaction and recover property or value transferred from Chemours in the transaction. The Dow-DuPont Merger and separation of Corteva from New DuPont likewise constitute a fraudulent transfer that entitles the State, among other things, to recover property and value transferred to New DuPont and Corteva.

**COUNT I**
**STRICT PRODUCTS LIABILITY – DEFECTIVE DESIGN**

254.     The State incorporates by reference the preceding paragraphs as though fully set forth herein.

255.     Defendants designed, manufactured, marketed, and sold PFAS Products that were transported, stored, used, handled, released, spilled, and/or disposed of in Maryland during the relevant period.

256.     As designers, manufacturers, marketers, and sellers of PFAS Products, Defendants had a duty to make and sell products that are reasonably fit, suitable, and safe for their intended or reasonably foreseeable uses. Defendants owed that duty both to reasonably foreseeable users of their products and also to any person or property that might reasonably be expected to come into contact with those products.

257.    Defendants' PFAS Products were used in a reasonably foreseeable manner and without substantial change in the condition of such products. These products were defective and unfit for their reasonable use at the time they left Defendants' possession or control. Defendants' PFAS Products foreseeably contaminated groundwater, surface water, sediments, soils, biota, and other natural resources throughout Maryland.

258.    Defendants knew, or reasonably should have known, that their manufacture, marketing, and/or sale, as well as their customers' transport, storage, use, handling, release, spilling, and/or disposal of PFAS Products in an intended or reasonably foreseeable manner would result in the release of PFAS into Maryland's environment.

259.    PFAS Products used throughout Maryland have injured and are continuing to injure groundwater, surface water, sediments, soils, biota, and other natural resources throughout Maryland.    Defendants' PFAS Products were defective in design and unreasonably dangerous because, among other things:

a.    Defendants' PFAS Products cause extensive and persistent PFAS contamination when used in a reasonably foreseeable and intended manner;

b.    PFAS released into the environment from Defendants' PFAS Products cause contamination in groundwater and surface water that are the sources of drinking water and pose significant threats to public health and welfare; and

c.    Defendants failed to disclose reasonable, appropriate, or adequate scientific studies to evaluate the environmental fate and transport and potential ecological and human health effects of PFAS.

260. At all times relevant to this action, the PFAS Products that Defendants designed, manufactured, marketed, and sold were dangerous to an extent beyond that which would be contemplated by the ordinary consumer.

261. At all times relevant to this action, the foreseeable risk to the environment and public health and welfare posed by Defendants' PFAS Products outweighed the cost to Defendants of reducing or eliminating such risk.

262. At all times relevant to this action, Defendants knew or should have known about reasonably safer and feasible alternatives to their PFAS Products, and the omission of such alternative designs rendered their PFAS Products not reasonably safe. While Defendants have recently transitioned to short-chain PFAS-based PFAS Products, which they claim are safer, they could have made this transition earlier. Moreover, PFAS Products can be designed with fluorine-free compounds, which do not contain or break down into PFAS.

263. As a direct and proximate result of the defects in Defendants' design, manufacture, marketing, and sale of PFAS Products, groundwater, surface water, sediments, soils, biota, and other natural resources throughout Maryland have become contaminated with PFAS, causing the State and its citizens significant injury and damage.

264. As a direct and proximate result of Defendants' acts and omissions, as alleged herein, the State has incurred, is incurring, and will continue to incur damages in an amount to be proved at trial related to PFAS contamination of groundwater, surface water, sediment, soils, biota, and other natural resources throughout Maryland where

Defendants' PFAS Products were transported, stored, used, handled, released, spilled, and/or disposed.

265.   As a further direct and proximate result of Defendants' acts and omissions as alleged herein, State has incurred, and will continue to incur, investigation, cleanup and removal, restoration, treatment, monitoring, and other costs and expenses related to contamination of the groundwater, surface water, sediments, soils, biota, and other natural resources throughout Maryland.

266.   Defendants knew it was substantially certain that their acts and omissions described above would cause the contamination and harms described herein.

267.   The PFAS Products were in a defective condition when they left Defendants' possession or control.

268.   The State and its citizens did not voluntarily expose themselves to the risks posed by PFAS Products while realizing the dangers.

269.   The State and its citizens did not unreasonably or knowingly expose themselves to the risk posed by PFAS Products.

270.   Defendants committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

271.   Defendants are strictly liable for all such damages, and the State is entitled to recover all such damages and other relief as set forth below.

272.   New DuPont and Corteva assumed Old DuPont's design defect liability described above.

## COUNT II
## STRICT PRODUCTS LIABILITY – FAILURE TO WARN

273.   The State incorporates by reference the preceding paragraphs as though fully set forth herein.

274.   As designers, manufacturers, marketers, and sellers of PFAS Products, Defendants had a strict duty to the State and to those who were foreseeably at risk of being harmed by PFAS Products to warn users of those products and the State of the foreseeable harms associated with them.

275.   Defendants had a duty to warn the State about the dangers of their PFAS Products because, among other things, the State is the trustee, for the benefit of its citizens, of all natural resources within its jurisdiction; because the State is charged with enforcing the State's environmental laws and regulations; and because the State maintains sovereign and "quasi-sovereign" interests in the well-being of its residents; and the State has proprietary interests in lands that it owns.

276.   Defendants inadequately warned of the likelihood that PFAS would be released into the environment during the normal use of Defendants' PFAS Products and of the widespread, toxic, and persistent effects of such releases. Defendants failed to provide such warnings to (i) users and buyers of their PFAS Products; (ii) the State; and (iii) others to which it was reasonably foreseeable Defendants' PFAS Products would cause harm.  To the extent Defendants provided any warnings about their products, those were not warnings that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger posed by PFAS Products, and the warnings did not convey

adequate information on the dangers of PFAS Products containing these chemicals to the mind of a reasonably foreseeable or ordinary user or bystander.

277. To the extent Defendants provided any warnings about their PFAS Products, those were not warnings that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger posed by the products. Any such warnings were not clear and did not convey sufficient information about the dangers of the chemicals within PFAS Products to alert an ordinary or reasonably foreseeable user or bystander.

278. Despite the fact that Defendants knew or should have known about the risks of PFAS Products, Defendants withheld such knowledge from the State, regulators, and the public. Moreover, Defendants affirmatively distorted and/or suppressed their knowledge and the scientific evidence linking their products to the unreasonable dangers they pose.

279. At no time relevant to this action did Defendants warn users and buyers of their PFAS Products, the State, and others whom Defendants should have reasonably foreseen would use their PFAS Products or be harmed by them, that Defendants' PFAS Products would release PFAS into the environment during the products' normal use. Defendants further failed to warn these entities and individuals of the widespread, toxic, and persistent effects of such releases.

280. Defendants' PFAS Products were in the same condition when they were purchased and/or used as they were when they left Defendants' control. Defendants'

customers used the PFAS Products in a reasonably foreseeable manner and without any substantial change in the condition of the products.

281.   Had Defendants provided adequate warnings about the hazards associated with their PFAS Products, the users and buyers of the Products, the State, and others who would reasonably foreseeably transport, store, use, release, dispose, and/or otherwise handle or be harmed by the PFAS Products would have heeded those warnings.

282.   As a direct and proximate result of Defendants' failure to warn of the hazards of PFAS Products, the groundwater, surface water, sediments, soils, biota, and other natural resources throughout Maryland have become contaminated with PFAS.

283.   As a direct and proximate result of Defendants' acts and omissions, the State has incurred, is incurring, and will continue to incur in the future damages related to PFAS contamination in an amount to be proven at trial.

284.   Defendants knew it was substantially certain that their acts and omissions described above would cause the State's injury and damage.

285.   Defendants committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

286.   Defendants are strictly liable for all such damages, and the State is entitled to recover all such damages and other relief as set forth below.

287.   New DuPont and Corteva assumed Old DuPont's failure to warn liability described above.

## COUNT III
## PUBLIC NUISANCE

288.    The State incorporates by reference the preceding paragraphs as though fully set forth herein.

289.    Groundwater, surface water, sediments, soils, and biota are natural resources of the State held in trust by the State.

290.    The use, enjoyment, and existence of uncontaminated natural resources is a right common to the general public.

291.    The contamination of the groundwater, surface water, sediment, soils, and biota throughout Maryland where Defendants' PFAS Products have come to be located constitutes a physical invasion of the State's natural resources and, on information and belief, the State's real property and an unreasonable and substantial interference, both actual and potential, with (i) the exercise of the public's common right to these natural resources; (ii) the State's special property and statutory status and obligations regarding the natural resources of the State; (iii) the State's ability to protect, conserve, and manage the natural resources of the State, which are by law precious and invaluable public resources held by the State in trust for the benefit of the public; and (iv) the rights of the people of the State to enjoy their natural resources free from interference by pollution and contamination.

292.    As long as these natural resources throughout Maryland remain contaminated by Defendants' PFAS Products, which are present due to Defendants' conduct, the public nuisance continues.

293.    Until these natural resources are restored to their pre-injury quality, Defendants are liable for the creation and continued presence of a public nuisance in contravention of the public's common right to clean natural resources.

294.    The discharge of PFAS from PFAS Products into drinking water constitutes a public nuisance because such discharges create a "condition that is dangerous to health and safety" including a "contaminated water supply" and an "inadequately protected water supply." Md. Code Ann. Health-Gen. § 20-301(a).

295.    Defendants marketed PFAS Products to their customers knowing that the use of their PFAS Products utilized exactly as marketed for their intended use would create a public nuisance.   Likewise, well after Defendants understood the mobile, persistent, bioaccumulative, and toxic nature of PFAS in the environment, Defendants never instructed their customers to stop using the PFAS Products in their possession or that they needed to specially dispose of PFAS Products so as to not further contaminate the natural resources of the State.

296.    Defendants committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

297.    New DuPont and Corteva assumed Old DuPont's nuisance liability described above.

## COUNT IV
## TRESPASS

298. The State incorporates by reference the preceding paragraphs as though fully set forth herein.

299. Defendants' intentional and/or negligent conduct caused PFAS Products to enter, invade, intrude upon, injure, trespass, and threaten to trespass upon the State's possessory interest in properties it owns, including but not limited to State lands, parks, wildlife management areas, tidal bodies of water, and certain lakes.

300. PFAS Products manufactured and/or supplied by Defendants continue to be located on or in the State's property.

301. Defendants intended to manufacture PFAS Products containing PFAS and/or their precursors and knew with substantial certainty that their acts would contaminate the State's property.

302. Defendants are therefore liable for trespass and continued trespass.

303. Defendants did not and do not have authority, privilege, or permission to trespass upon the aforesaid possessory property interests.

304. The State has never consented to the trespasses alleged herein.

305. Defendants have refused and failed to terminate their trespasses, despite being put on notice to do so by the State through its policies, statutes, regulations, orders, and other means.

306.    Defendants' trespass is of a continuing nature and has produced a long-lasting negative effect upon the property of the State, as Defendants knew or had reason to know at all times relevant hereto.

307.    Based on their conduct, Defendants have, at all times relevant to this action, created, caused, maintained, continued, substantially contributed to, substantially participated in, and/or assisted in the creation of such trespass. Based on their knowledge of the properties and manner of distribution, use, and storage of PFAS Products, as alleged herein, Defendants were or should have been aware that as a result of their conduct, contamination of the State's property was inevitable or substantially certain to result.

308.    As a direct and proximate cause of Defendants' conduct, the State has suffered and continues to suffer damages from Defendants' conduct and the presence of PFAS Products in the State's property, including without limitation costs to assess, investigate, monitor, analyze and remediate contamination, costs to prevent PFAS Products from injuring additional property of the State, and costs to restore and replace the State's impacted natural resources whose use has been lost or degraded.

309.    As a direct and proximate result of Defendants' acts and omissions, the State has incurred and suffered, and will continue to incur and suffer, substantial costs and damages for which Defendants are liable.

310.    New DuPont and Corteva assumed Old DuPont's trespass liability described above.

## COUNT V
## NEGLIGENCE

311.   The State incorporates by reference the preceding paragraphs as though fully set forth herein.

312.   Defendants had a duty to the State to ensure that PFAS were not released as a result of the transport, storage, use, handling, release, spilling, and/or disposal of their PFAS Products and did not injure groundwater, surface water, sediment, soils, and biota in Maryland.

313.   Defendants had a duty to the State to exercise due care in the design, manufacture, marketing, sale, testing, labeling, and instructions for use of their PFAS Products.

314.   Defendants breached these duties, by among other things failing to conform to the requisite standard of care.

315.   Groundwater, surface water, sediments, soils, biota, and other natural resources throughout Maryland where Defendants' PFAS Products have come to be located have become contaminated with PFAS as a direct and proximate result of Defendants' negligence in designing PFAS Products and in failing to warn PFAS Products purchasers, the State, and others whom Defendants should have reasonably foreseen would transport, store, use, handle, release, spill, and/or dispose, or be harmed by the PFAS Products.

316.   As a direct and proximate result of the contamination of the environment from Defendants' PFAS Products, the State has incurred, is incurring, and will continue to

incur investigation, clean up and removal, treatment, monitoring, and restoration costs and expenses for which Defendants are liable.

317.    Defendants committed each of the above-described acts and omissions with actual malice or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

318.    New DuPont and Corteva assumed Old DuPont's negligence liability described above.

## COUNT VI
## ENVIRONMENT ARTICLE, TITLE 9, SUBTITLE 3 CLAIM

319.    The State incorporates by reference the preceding paragraphs as though set forth at length herein.

320.    The Secretary of MDE "[h]as supervision and control over the sanitary and physical condition of the waters of this State to protect public health and comfort[.]" Env't § 9-252(b).

321.    Pursuant to § 9-322 of the Environment Article, "a person may not discharge any pollutant into the waters of this State" without a permit.

322.    "'Discharge' means: (1) The addition, introduction, leaking, spilling, or emitting of a pollutant into the waters of this State; or (2) The placing of a pollutant in a location where the pollutant is likely to pollute." *Id.* § 9-101(b).

323.    "Pollutant" includes "[a]ny . . . liquid, gaseous, solid, or other substance that will pollute any waters of this State." *Id.* § 9-101(g). "'Pollution' means any contamination or other alteration of the physical, chemical, or biological properties of any waters of this

State, including a change in . . . taste, color, turbidity, or odor of the waters or the discharge or deposit of any . . . liquid . . . or other substance into any waters of this State that will render the waters harmful or detrimental to: (1) Public health, safety, or welfare; (2) Domestic, commercial, industrial, agricultural, recreational, or other legitimate beneficial uses; (3) Livestock, wild animals, or birds; or (4) Fish or other aquatic life." *Id.* § 9-101(h).

324.    The "Department may bring an action for an injunction against any person who violates any provision of [Subtitle 3] or any rule, regulation, order, or permit adopted or issued by the Department under [Subtitle 3]." *Id.* § 9-339(a). The "court shall grant an injunction without requiring a showing of a lack of an adequate remedy at law." *Id.* § 9-339(c).

325.    Defendants are responsible for discharges of PFAS Products into the waters of the State.  As Defendants violated and continue to violate Title 9, Subtitle 3 by discharging PFAS products throughout the State, the Department is empowered to seek an injunction ordering Defendants to investigate and fully delineate horizontally and vertically the full extent of all contamination for which the Defendants are responsible and to ensure the cleanup of such contamination so that the waters of the State are in the same state they existed prior to the discharges. *Id.* §§ 9-339(c); 9-302(b)(1) ("To improve, conserve, and manage the quality of the waters of this State"); 9-302(b)(2) ("To protect, maintain, and improve the quality of the water . . . .").

326.    Because Defendants discharged PFAS Products into the waters of this State, they "shall reimburse the Department for the reasonable costs incurred by the Department in conducting environmental health monitoring or testing, including the costs of collecting

69

and analyzing soil samples, surface water samples, or groundwater samples for the purpose of assessing the effect on public health and the environment of the [Defendants'] discharge[s]." *Id.* § 9-342.2; *see* COMAR 26.14.01.04.

327.    New DuPont and Corteva assumed Old DuPont's liability described above.

## COUNT VII
## ENVIRONMENT ARTICLE, TITLE 9, SUBTITLE 4 CLAIM

328.    The State incorporates by reference the preceding paragraphs as though set forth at length herein.

329.    PFAS Products are "dangerous contaminant[s]" because when they are "present in a public water system, they present an imminent and substantial danger to the health of individuals." Env't § 9-405(a).

330.    Upon receipt of information that PFAS Products "[are] present in or likely to enter a public water system," the Secretary of MDE "may take any action necessary to protect the health of the individuals whose health is or would be endangered" by the PFAS Products. *Id.* § 9-405(b)(1). The actions the Secretary may take include suing "for injunctive or other appropriate relief." *Id.* § 9-405(b)(2)(ii).

331.    To stop PFAS Products from entering public water systems, the Secretary may seek an injunction that orders Defendants to investigate and fully delineate horizontally and vertically the full extent of all contamination for which the Defendants are responsible and to ensure the cleanup so that the water is in the same state it was in prior to the discharges.

332.    New DuPont and Corteva assumed Old Dupont's liability described above.

## COUNT VIII
## ACTUAL FRAUDULENT TRANSFER IN RELATION TO CHEMOURS SPINOFF
### (Old DuPont, Chemours, New DuPont, and Corteva Only)

333.    The State incorporates the preceding paragraphs as though fully set forth herein.

334.    The State seeks equitable and other relief against Old DuPont and Chemours under §§ 15-201 to -214 of the Commercial Law Article and Delaware Code title 6, §§ 1301 to 1312.

335.    Under Commercial Law § 15-207 and Delaware Code title 6, § 1304(a)(1), a transaction made by a debtor "with actual intent . . . to hinder, delay, or defraud any present or future creditor" is voidable as to the creditor's claim.

336.    Under Commercial Law § 15-201 and Delaware Code title 6, §§ 1301(3), (4), a "creditor" is "a person who has any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed, or contingent."

337.    The State is and was a creditor of Chemours at all relevant times.

338.    Through its participation in the Chemours Spinoff, as detailed above, Chemours transferred valuable assets to DuPont, including the $3.9 billion dividend (the "Chemours Transfers"), while simultaneously assuming significant liabilities pursuant to the Separation Agreement (the "Chemours Assumed Liabilities").

339.    The Chemours Transfers and Chemours Assumed Liabilities were made to or for the benefit of Old DuPont.

71

340.    At the time that the Chemours Transfers were made and the Chemours Assumed Liabilities were assumed, and until the Chemours Spinoff was complete, Old DuPont was in a position to, and in fact did, control and dominate Chemours.

341.    Old DuPont and Chemours acted with the actual intent to hinder, delay, and defraud creditors or future creditors such as the State.

342.    The State has been harmed as a result of the Chemours Transfers.

343.    Old DuPont and Chemours engaged in acts in furtherance of a scheme to transfer its assets out of the reach of parties such as the State that have been damaged as a result of the actions described in this Complaint.

344.    Pursuant to Commercial Law §§ 15-201 to -214 and Delaware Code title 6, §§ 1301 to 1312, the State seeks to avoid the Chemours Transfers and to recover property or value that Chemours transferred to Old DuPont.

345.    Pursuant to Commercial Law §§ 15-201 to -214 and Delaware Code title 6, §§ 1301 to 1312, the State also seeks to enjoin Old DuPont, as transferee, from distributing, transferring, capitalizing, or otherwise disposing of any property or value that Chemours transferred to Old DuPont, and seeks a constructive trust over such property or value for the benefit of the State.

346.    Upon information and belief, Corteva and New DuPont assumed Old DuPont's liability described above.

347.    The State further reserves such other rights and remedies that may be available under Commercial Law §§ 15-201 to -214 and Delaware Code title 6, §§ 1301 to

1312, as may be necessary to fully compensate the State for the damages and injuries suffered as alleged in this Complaint.

**COUNT IX**
**CONSTRUCTIVE FRAUDULENT TRANSFER IN RELATION TO CHEMOURS SPINOFF**
**(Old DuPont, Chemours, New DuPont, and Corteva Only)**

348.    The State incorporates by reference the preceding paragraphs as though fully set forth herein.

349.    The State seeks equitable and other relief against Old DuPont and Chemours under §§ 15-201 to -214 of the Commercial Law Article and Delaware Code title 6, §§ 1301 to 1312.

350.    Under Commercial Law §§ 15-204, 15-205, 15-206, and Delaware Code title 6, §§ 1304(a)(2), 1305(a), a transaction made by a debtor "without a fair consideration" is voidable if the debtor (i) "is engaged or is about to engage in a business or a transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital"; (ii) "intends or believes that he will incur debts beyond his ability to pay as they mature"; or (iii) "is rendered insolvent by" the transaction.

351.    Chemours did not receive a fair or reasonably equivalent value from Old DuPont in exchange for the Chemours Transfers and Chemours Assumed Liabilities.

352.    Each of the Chemours Transfers and Chemours' assumption of the Chemours Assumed Liabilities was made to or for the benefit of Old DuPont.

353.   At the time that the Chemours Transfers were made and the Chemours Assumed Liabilities were assumed, and until the Spinoff was complete, Old DuPont was in a position to, and in fact did, control and dominate Chemours.

354.   Chemours made the Chemours Transfers and assumed the Chemours Assumed Liabilities when it was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business and debt obligations.

355.   Chemours was insolvent at the time or became insolvent as a result of the Chemours Transfers and its assumption of the Chemours Assumed Liabilities.

356.   At the time that the Chemours Transfers were made and Chemours assumed the Chemours Assumed Liabilities, Chemours intended to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

357.   The State has been harmed as a result of the Chemours Transfers.

358.   Pursuant to Commercial Law §§ 15-201 to -214 and Delaware Code title 6, §§ 1301 to 1312, the State seeks to void the Chemours Transfers and to recover property or value transferred to Old DuPont.

359.   Pursuant to Commercial Law §§ 15-201 to -214 and Delaware Code title 6, §§ 1301 to 1312, the State also seeks to enjoin Old DuPont, as transferee, from distributing, transferring, capitalizing, or otherwise disposing of any property or value that Chemours transferred to Old DuPont, and seeks a constructive trust over such property or value for the benefit of the State.

360.   Upon information and belief, Corteva and New DuPont assumed Old DuPont's liability described above.

361.   The State further reserves such other rights and remedies that may be available under Commercial Law §§ 15-201 to -214 and Delaware Code title 6, §§ 1301 to 1312 as may be necessary to fully compensate the State for the damages and injuries suffered as alleged in this Complaint.

### COUNT X
### ACTUAL FRAUDULENT TRANSFER IN RELATION TO THE DOW-DUPONT MERGER AND SUBSEQUENT REORGANIZATIONS, DIVESTITURES, AND SEPARATION OF CORTEVA
### (Old DuPont, New DuPont, and Corteva Only)

362.   The State incorporates by reference the preceding paragraphs as though fully set forth herein.

363.   The State seeks equitable and other relief against Old DuPont, New DuPont, and Corteva under §§ 15-201 to -214 of the Commercial Law Article and Delaware Code title 6, §§ 1301 to 1312.

364.   The State is and was a creditor of Old DuPont at all relevant times.

365.   Old DuPont knew that the Chemours Spinoff alone would not isolate its valuable assets and business lines from the Chemours Assumed Liabilities. Thus, the Chemours Spinoff was the first step in the overall scheme to separate Old DuPont's assets from its massive liabilities.   Through the Dow-DuPont Merger and the subsequent reorganizations, divestitures, and separation of Corteva, Old DuPont sold or transferred, directly or indirectly, valuable assets and business lines to Corteva and New DuPont (the "Old DuPont Transfers").

366.   The Old DuPont Transfers were made for the benefit of New DuPont or Corteva.

367.   At the time that the Old DuPont Transfers were made, New DuPont was in a position to, and in fact did, control and dominate Old DuPont and Corteva.

368.   Old DuPont, New DuPont, and Corteva acted with the actual intent to hinder, delay and defraud creditors or future creditors such as the State.

369.   The State has been harmed as a result of the Old DuPont Transfers.

370.   Old DuPont engaged in acts in furtherance of a scheme to transfer its assets out of the reach of parties such as the State that has been damaged as a result of the actions described in this Complaint.

371.   Pursuant to Commercial Law §§ 15-201 to -214 and Delaware Code title 6, §§ 1301 to 1312, the State seeks to void the Old DuPont Transfers and to recover property or value transferred to New DuPont and Corteva.

372.   Pursuant to Commercial Law §§ 15-201 to -214 and Delaware Code title 6, §§ 1301 to 1312, the State also seeks to enjoin New DuPont and Corteva, as transferees, from distributing, transferring, capitalizing, or otherwise disposing of any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Old DuPont, and seek a constructive trust over such proceeds for the benefit of the State.

373.   The State further reserves such other rights and remedies that may be available under Commercial Law §§ 15-201 to -214 and Delaware Code title 6, §§ 1301 to 1312 as may be necessary to fully compensate the State for the damages and injuries suffered as alleged in this Complaint.

## COUNT XI
## CONSTRUCTIVE FRAUDULENT TRANSFER IN RELATION TO THE DOW-DUPONT MERGER AND SUBSEQUENT REORGANIZATIONS, DIVESTITURES, AND SEPARATION OF CORTEVA
### (Old DuPont, New DuPont, and Corteva Only)

374.    The State incorporates by reference the preceding paragraphs as though fully set forth herein.

375.    The State seeks equitable and other relief against Old DuPont, New DuPont, and Corteva under §§ 15-201 to -214 of the Commercial Law Article and Delaware Code title 6, §§ 1301 to 1312.

376.    Old DuPont knew that the Chemours Spinoff alone would not isolate its valuable assets and business lines from the Chemours Assumed Liabilities. Thus, the Chemours Spinoff was the first step in the overall scheme to separate Old DuPont's assets from its massive liabilities.    Through the Dow-DuPont Merger and the subsequent reorganizations, divestitures, and separation of Corteva, Old DuPont engaged in the Old DuPont Transfers.

377.    Old DuPont did not receive a fair or reasonably equivalent value from New DuPont and Corteva in exchange for the Old DuPont Transfers.

378.    Each of the Old DuPont Transfers was made to or for the benefit of New DuPont or Corteva.

379.    At the time that the Old DuPont Transfers were made, New DuPont was in a position to, and in fact did, control and dominate Old DuPont and Corteva.

380.    Old DuPont made the Old DuPont Transfers when it was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business.

381.    Old DuPont was insolvent at the time or became insolvent as a result of the Old DuPont Transfers.

382.    At the time that the Old DuPont Transfers were made, Old DuPont intended to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

383.    The State has been harmed as a result of the Old DuPont Transfers.

384.    Pursuant to Commercial Law §§ 15-201 to -214 and Delaware Code title 6, §§ 1301 to 1312, the State seeks to void the Old DuPont Transfers and to recover property or value transferred to New DuPont and Corteva.

385.    Pursuant to Commercial Law §§ 15-201 to -214 and Delaware Code title 6, §§ 1301 to 1312, the State also seeks to enjoin New DuPont and Corteva, as transferees, from distributing, transferring, capitalizing, or otherwise disposing of any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Old DuPont, and seeks a constructive trust over such proceeds for the benefit of the State.

386.    The State further reserves such other rights and remedies that may be available under Commercial Law §§ 15-201 to -214 and Delaware Code title 6, §§ 1301 to 1312, as may be necessary to fully compensate the State for the damages and injuries suffered as alleged in this Complaint.

## PRAYER FOR RELIEF

**WHEREFORE,** the State requests that this Court enter judgment against Defendants as follows:

a.      Finding Defendants liable for all costs, in an amount that exceeds $75,000.00, to investigate, clean up and remove, restore, treat, monitor, and otherwise respond to PFAS contamination throughout Maryland where Defendants' PFAS Products were transported, stored, used, handled, released, spilled, and/or disposed so the contaminated natural resources are restored to their original condition;

b.      Finding Defendants liable for all damages, in an amount that exceeds $75,000.00, to compensate the citizens of the State for the lost use and value of its natural resources during all times of injury caused by PFAS Products and for such orders as may be necessary to provide full relief to address risks to the State, including, but not limited to, the costs of:

i.      Past and future testing of natural resources throughout Maryland where Defendants' PFAS Products were transported, stored, used, handled, released, spilled, and/or disposed and, thus, likely caused PFAS contamination;

ii.      Past and future treatment of all natural resources throughout Maryland where Defendants' PFAS Products were transported, stored, used, handled, released, spilled, and/or disposed and which contain detectable levels of PFAS until restored to non-detectable levels; and

iii.      Past and future monitoring of the State's natural resources throughout Maryland where Defendants' PFAS Products were transported, stored, used,

handled, released, spilled, and/or disposed as long as there is a detectable presence of PFAS, and restoration of such natural resources to their pre-discharge condition;

c.    Ordering Defendants to pay for all costs, in an amount that exceeds $75,000.00, related to the investigation, cleanup, restoration, treatment, and monitoring of PFAS contamination of the State's natural resources attributable to Defendants' PFAS Products;

d.    Ordering Defendants to pay all damages to the State, in an amount that exceeds $75,000.00, at least equal to the full cost of restoring the State's natural resources to their original condition prior to the PFAS contamination attributable to Defendants' PFAS Products;

e.    Ordering Defendants to pay all compensatory damages, in an amount that exceeds $75,000.00, for economic damages and for the lost value (including lost use) of the State's natural resources as a result of the PFAS contamination attributable to Defendants' PFAS Products of such natural resources;

f.    Ordering Defendants to pay all other damages sustained by the State in its public trustee, *parens patriae*, and regulatory capacities as a direct and proximate result of Defendants' acts and omissions alleged herein;

g.    Entering an order against Defendants to abate or mitigate the PFAS contamination that they caused by their PFAS Products throughout the State;

h.    Voiding the Old DuPont Transfers to the extent necessary to satisfy the State's claims;

i.      Voiding the Chemours Transfers to the extent necessary to satisfy the State's claims;

j.      Awarding the State punitive damages in an amount to be determined by the trier of fact;

k.      Awarding the State costs and fees in this action, including reasonable attorneys' fees, incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

l.      Awarding the State such other relief as this Court deems appropriate.

## DEMAND FOR JURY TRIAL

The State demands trial by jury of all issues so triable.

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland

*Patricia V. Tipon*

PATRICIA V. TIPON
Attorney No. 0806170244
JULIE KUSPA
Attorney No. 0912160009
MATTHEW ZIMMERMAN
Attorney No. 8005010219
Assistant Attorneys General
Office of the Attorney General
1800 Washington Boulevard, Suite 6048
Baltimore, Maryland 21230
patricia.tipon@maryland.gov
matthew.zimmerman@maryland.gov
julie.kuspa@maryland.gov
(410) 537-3061
(410) 537-3943 (facsimile)

ADAM D. SNYDER
Attorney No. 9706250439
Assistant Attorney General
Office of the Attorney General
301 West Preston Street, Suite 1101
Baltimore, Maryland 21201
adam.snyder1@maryland.gov
(410) 767-1409

JOHN KUCHNO
Attorney No. 851201343
Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
jkuchno@oag.state.md.us
(410) 576-7847

May 30, 2023

IN THE CIRCUIT COURT FOR Baltimore City
                                    (City/County)

## CIVIL – NON-DOMESTIC CASE INFORMATION SHEET

### DIRECTIONS

*Plaintiff:* This Information Report must be completed and attached to the complaint filed with the Clerk of Court unless your case is exempted from the requirement by the Chief Justice of the Supreme Court of Maryland pursuant to Rule 2-111(a).
   *Defendant:* You must file an Information Report as required by Rule 2-323(h).
   ***THIS INFORMATION REPORT CANNOT BE ACCEPTED AS A PLEADING***

**FORM FILED BY:** ☒ PLAINTIFF ☐ DEFENDANT     CASE NUMBER _____
                                                                      (Clerk to insert)
**CASE NAME:** State of Maryland _____ vs. 3M Company, Corteva, Inc., et al.
PARTY'S NAME: MD Dep't of Envt.MD Dep't of Nat'l Res.,MD Dep't of Hlth. PHONE: 410-537-3000
                        Plaintiff                                                      Defendant
PARTY'S ADDRESS: 1800 Washington Blvd., Baltimore, Maryland 21230
PARTY'S E-MAIL: patricia.tipon@maryland.gov
**If represented by an attorney:**
PARTY'S ATTORNEY'S NAME: Patricia Tipon and Julie Kuspa ___ PHONE: 410-537-3061 & 3352
PARTY'S ATTORNEY'S ADDRESS:  1800 Washington Blvd, Suite 6048, Baltimore Maryland 21230
PARTY'S ATTORNEY'S E-MAIL:  patricia.tipon@maryland.gov; julie.kuspa@maryland.gov
**JURY DEMAND?** ☒ Yes ☐ No
**RELATED CASE PENDING?** ☐ Yes ☒ No If yes, Case #(s), if known: _____
**ANTICIPATED LENGTH OF TRIAL?:** _____ hours >30 days

### PLEADING TYPE

**New Case:** ☒ Original          ☐ Administrative Appeal      ☐ Appeal
**Existing Case:** ☐ Post-Judgment      ☐ Amendment
*If filing in an existing case,* skip Case Category/ Subcategory section – go to Relief section.

### IF NEW CASE: CASE CATEGORY/SUBCATEGORY (Check one box.)

**TORTS**
☐ Asbestos
☐ Assault and Battery
☒ Business and Commercial
☒ Conspiracy
☐ Conversion
☐ Defamation
☐ False Arrest/Imprisonment
☒ Fraud
☐ Lead Paint – DOB of Youngest Plt:_____
☐ Loss of Consortium
☐ Malicious Prosecution
☐ Malpractice-Medical
☐ Malpractice-Professional
☐ Misrepresentation
☐ Motor Tort
☒ Negligence
☒ Nuisance
☐ Premises Liability
☒ Product Liability
☐ Specific Performance
☒ Toxic Tort
☒ Trespass
☐ Wrongful Death

**CONTRACT**
☐ Asbestos
☐ Breach
☐ Business and Commercial
☐ Confessed Judgment (Cont'd)
☐ Construction
☐ Debt
☐ Fraud

**PROPERTY**
☐ Government
☐ Insurance
☐ Product Liability
**PROPERTY**
☐ Adverse Possession
☐ Breach of Lease
☐ Detinue
☐ Distress/Distrain
☐ Ejectment
☐ Forcible Entry/Detainer
☐ Foreclosure
   ☐ Commercial
   ☐ Residential
   ☐ Currency or Vehicle
   ☐ Deed of Trust
   ☐ Land Installments
   ☐ Lien
   ☐ Mortgage
   ☐ Right of Redemption
   ☐ Statement Condo
☐ Forfeiture of Property / Personal Item
☒ Fraudulent Conveyance
☐ Landlord-Tenant
☐ Lis Pendens
☐ Mechanic's Lien
☐ Ownership
☐ Partition/Sale in Lieu
☐ Quiet Title
☐ Rent Escrow
☐ Return of Seized Property
☐ Right of Redemption
☐ Tenant Holding Over

**PUBLIC LAW**
☐ Attorney Grievance
☐ Bond Forfeiture Remission
☐ Civil Rights
☐ County/Mncpl Code/Ord
☐ Election Law
☐ Eminent Domain/Condemn.
☒ Environment
☐ Error Coram Nobis
☐ Habeas Corpus
☐ Mandamus
☐ Prisoner Rights
☐ Public Info. Act Records
☐ Quarantine/Isolation
☐ Writ of Certiorari
**EMPLOYMENT**
☐ ADA
☐ Conspiracy
☐ EEO/HR
☐ FLSA
☐ FMLA
☐ Worker's Compensation
☐ Wrongful Termination
**INDEPENDENT PROCEEDINGS**
☐ Assumption of Jurisdiction
☐ Authorized Sale
☐ Attorney Appointment
☐ Body Attachment Issuance
☐ Commission Issuance

☐ Constructive Trust
☐ Contempt
☐ Deposition Notice
☐ Dist Ct Mtn Appeal
☐ Financial
☐ Grand Jury/Petit Jury
☐ Miscellaneous
☐ Perpetuate Testimony/Evidence
☐ Prod. of Documents Req.
☐ Receivership
☐ Sentence Transfer
☐ Set Aside Deed
☐ Special Adm. – Atty
☐ Subpoena Issue/Quash
☐ Trust Established
☐ Trustee Substitution/Removal
☐ Witness Appearance-Compel
**PEACE ORDER**
☐ Peace Order
**EQUITY**
☐ Declaratory Judgment
☒ Equitable Relief
☒ Injunctive Relief
☐ Mandamus
**OTHER**
☐ Accounting
☐ Friendly Suit
☐ Grantor in Possession
☐ Maryland Insurance Administration
☐ Miscellaneous
☐ Specific Transaction
☐ Structured Settlements

CC-DCM-002 (Rev. 12/2022)          Page 1 of 3

## IF NEW OR EXISTING CASE: RELIEF (Check All that Apply)

| | | | |
|---|---|---|---|
| ☐ Abatement | ☐ Earnings Withholding | ☐ Judgment-Default | ☐ Reinstatement of Employment |
| ☐ Administrative Action | ☐ Enrollment | ☒ Judgment-Interest | ☐ Return of Property |
| ☐ Appointment of Receiver | ☐ Expungement | ☐ Judgment-Summary | ☐ Sale of Property |
| ☐ Arbitration | ☐ Financial Exploitation | ☒ Liability | ☐ Specific Performance |
| ☐ Asset Determination | ☐ Findings of Fact | ☐ Oral Examination | ☐ Writ-Error Coram Nobis |
| ☐ Attachment b/f Judgment | ☐ Foreclosure | ☒ Order | ☐ Writ-Execution |
| ☐ Cease & Desist Order | ☒ Injunction | ☐ Ownership of Property | ☐ Writ-Garnish Property |
| ☐ Condemn Bldg | ☐ Judgment-Affidavit | ☐ Partition of Property | ☐ Writ-Garnish Wages |
| ☐ Contempt | ☒ Judgment-Attorney Fees | ☐ Peace Order | ☐ Writ-Habeas Corpus |
| ☒ Court Costs/Fees | ☐ Judgment-Confessed | ☐ Possession | ☐ Writ-Mandamus |
| ☒ Damages-Compensatory | ☐ Judgment-Consent | ☐ Production of Records | ☐ Writ-Possession |
| ☒ Damages-Punitive | ☐ Judgment-Declaratory | ☐ Quarantine/Isolation Order | |

*If you indicated **Liability** above,* mark one of the following. This information is <u>not</u> an admission and may not be used for any purpose other than Track Assignment.

☐ Liability is conceded.    ☐ Liability is not conceded, but is not seriously in dispute.    ☒ Liability is seriously in dispute.

## MONETARY DAMAGES (Do not include Attorney's Fees, Interest, or Court Costs)

☐ Under $10,000        ☐ $10,000 - $30,000        ☐ $30,000 - $100,000        ☒ Over $100,000

☐ Medical Bills $ _____        ☐ Wage Loss $ _____        ☐ Property Damages $ _____

## ALTERNATIVE DISPUTE RESOLUTION INFORMATION

Is this case appropriate for referral to an ADR process under Md. Rule 17-101? (Check all that apply)
A. Mediation          ☒ Yes  ☐ No          C. Settlement Conference     ☒ Yes  ☐ No
B. Arbitration        ☐ Yes  ☒ No          D. Neutral Evaluation        ☐ Yes  ☒ No

## SPECIAL REQUIREMENTS

☐ If a Spoken Language Interpreter is needed, **check here and attach form CC-DC-041**

☐ If you require an accommodation for a disability under the Americans with Disabilities Act, **check here and attach form CC-DC-049**

## ESTIMATED LENGTH OF TRIAL

*With the exception of Baltimore County and Baltimore City, please fill in the estimated **LENGTH OF TRIAL**.*
                              *(Case will be tracked accordingly)*

☐ 1/2 day of trial or less          ☐ 3 days of trial time
☐ 1 day of trial time               ☐ More than 3 days of trial time
☐ 2 days of trial time

## BUSINESS AND TECHNOLOGY CASE MANAGEMENT PROGRAM

*For all jurisdictions, if Business and Technology track designation under Md. Rule 16-308 is requested, attach a duplicate copy of complaint and check one of the tracks below.*

☐ **Expedited** - Trial within 7 months of          ☐ **Standard** - Trial within 18 months of

Defendant's response                                Defendant's response

EMERGENCY RELIEF REQUESTED

## COMPLEX SCIENCE AND/OR TECHNOLOGICAL CASE MANAGEMENT PROGRAM (ASTAR)

*FOR PURPOSES OF POSSIBLE SPECIAL ASSIGNMENT TO ASTAR RESOURCES JUDGES under Md. Rule 16-302, attach a duplicate copy of complaint and check whether assignment to an ASTAR is requested.*

☐ **Expedited** - Trial within 7 months of Defendant's response

☐ **Standard** - Trial within 18 months of Defendant's response

*IF YOU ARE FILING YOUR COMPLAINT IN BALTIMORE CITY OR BALTIMORE COUNTY, PLEASE FILL OUT THE APPROPRIATE BOX BELOW.*

### CIRCUIT COURT FOR BALTIMORE CITY (CHECK ONLY ONE)

| | |
|---|---|
| ☐ Expedited | Trial 60 to 120 days from notice. Non-jury matters. |
| ☐ Civil-Short | Trial 210 days from first answer. |
| ☐ Civil-Standard | Trial 360 days from first answer. |
| ☒ Custom | Scheduling order entered by individual judge. |
| ☐ Asbestos | Special scheduling order. |
| ☐ Lead Paint | Fill in: Birth Date of youngest plaintiff_____. |
| ☐ Tax Sale Foreclosures | Special scheduling order. |
| ☐ Mortgage Foreclosures | No scheduling order. |

### CIRCUIT COURT FOR BALTIMORE COUNTY

| | |
|---|---|
| ☐ Expedited (Trial Date-90 days) | Attachment Before Judgment, Declaratory Judgment (Simple), Administrative Appeals, District Court Appeals and Jury Trial Prayers, Guardianship, Injunction, Mandamus. |
| ☐ Standard (Trial Date-240 days) | Condemnation, Confessed Judgments (Vacated), Contract, Employment Related Cases, Fraud and Misrepresentation, International Tort, Motor Tort, Other Personal Injury, Workers' Compensation Cases. |
| ☐ Extended Standard (Trial Date-345 days) | Asbestos, Lender Liability, Professional Malpractice, Serious Motor Tort or Personal Injury Cases (medical expenses and wage loss of $100,000, expert and out-of-state witnesses (parties), and trial of five or more days), State Insolvency. |
| ☐ Complex (Trial Date-450 days) | Class Actions, Designated Toxic Tort, Major Construction Contracts, Major Product Liabilities, Other Complex Cases. |

May 30, 2023
_____
Date

1800 Washington Blvd., Suite 6048
_____
Address

Baltimore        MD        21230
_____
City        State        Zip Code

_____    0806170244
Signature of Attorney / Party    Attorney Number

Patricia V. Tipon
_____
Printed Name

**CC-DCM-002** (Rev. 12/2022)                    Page 3 of 3